**Lynn K. ENGSTRAND, Plaintiff,**

v.

**PIONEER HI–BRED INTERNATIONAL, INC., Defendant.**

Civil No. 4–94–CV–20326.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 20, 1996.

Victoria L. Herring, Des Moines, IA, for plaintiff.

Thomas M. Cunningham, Des Moines, IA, for defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BREMER, Chief United States Magistrate Judge.

This matter comes before the court on Defendant's Motion for Summary Judgment.

Plaintiff asserts claims in the following Counts: I) discrimination based on gender, pursuant to 42 U.S.C. § 2000e *et seq.* (Title VII); II) discrimination based on age, pursu-

ant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.;* III) assault; IV) discrimination based on age and gender pursuant to the Iowa Civil Rights Act, Iowa Code Chapter 216; V) negligent hiring and retention; VI) breach of contract; VII) promissory estoppel; and VIII) fraudulent misrepresentation. Plaintiff timely filed this suit, after receiving a right to sue letter from the Equal Employment Opportunity Commission and the Iowa Civil Rights Commission.

On April 11, 1996, Plaintiff resisted Defendant's Motion for Summary Judgment on all counts except breach of contract (Count VI) and fraudulent misrepresentation (Count VIII). Defendant filed a reply brief on April 30, 1996. On July 2 and July 26, 1996, Plaintiff moved to supplement her resistance to the Motion for Summary Judgment, and the court granted the motions. A hearing on the Motion for Summary Judgment was held July 30, 1996. This matter is fully submitted.

### I. MATERIAL FACTS NOT IN DISPUTE

The following facts are either not in dispute, or are those viewed in the light most favorable to the plaintiff, Lynn Engstrand.

This litigation arises out of Engstrand's employment with Defendant Pioneer Hi-Bred International, Inc. (Pioneer), where she worked as General Manager of Operations for Pioneer–Hungary. Engstrand's tenure with Pioneer lasted from December 1, 1990, to May 27, 1992. When Engstrand was hired, she was 55 years old; at her termination, she was 56.

André Fagét, Pioneer's Director of Europe, decided in early 1990 to hire a person to establish a wholly-owned subsidiary in Hungary. Fagét first offered the position to a Hungarian woman in her mid-forties, who declined the offer.

In November 1990, Fagét interviewed Engstrand. His second question to her was, "How old are you?" (Engstrand Aff. at ¶ 8.) Fagét and Engstrand were the same age.

Fagét offered Engstrand the position of General Manager in Hungary, with a salary

of $100,000 per year, and a bonus up to approximately 25 percent. Engstrand and Fagét did not discuss performance evaluations. Engstrand received no contract; she understood that she would be an at-will employee. At that time, one other woman in Europe worked for Pioneer as a general manager.

Engstrand's office would be in Budapest, Hungary; she would report directly to Fagét in Paris, France. She was to work in Europe for a maximum of five years, pursuant to Pioneer's policy. Pioneer attempted to provide positions for employees returning to the United States after working overseas. The Expatriate Manual, which Engstrand received, explained this policy in detail. The manual stated that provision of a job in the United States depended on several factors, including work availability.

Pioneer's "Manager's Guide to Policies & Procedures" states that each employee shall receive a yearly evaluation. The guide's introduction, however, states the guide applies only to "full-time regular employees of Pioneer in the U.S." and "[w]hile the specific policies and procedures are not applicable globally, the basic principles reflect the business approach of Pioneer worldwide."

Fagét did not provide Engstrand a written evaluation during the first year. Fagét typically evaluated employees by asking them to set performance goals and evaluate their progress in reaching the goals. Fagét asked Engstrand to write an evaluation of her progress in attaining her goals for Pioneer–Hungary, and the record indicates she did.

During her first year with Pioneer, Engstrand received a fifteen percent bonus. Fagét eventually raised Engstrand's salary to $105,000 and her bonus to twenty percent.

In November 1991, Pioneer held a worldwide meeting of managers in Bangkok, Thailand. Executives announced the new Director of Central Europe would be Fayte Brewer. Brewer would report to Fagét.

Brewer announced at the meeting that he would move Pioneer–Hungary from the Western Europe Division back to the Central Europe Division, where it had been. After the move, Engstrand would report to Brewer, not Fagét. Engstrand and Brewer met for the first time at this meeting.

The news about Pioneer–Hungary's organizational move concerned Engstrand. She worried about how she would break the news to her team; she believed Pioneer–Hungary employees wanted to be part of the Western Europe Division. At the Budapest meeting, Engstrand expressed her concern to Edward Shonsey, Vice–President of International Operations. (Def.'s Suppl.Ex. in Supp.Mot. Summ.J., Engstrand Dep. at 218–19.) She stated in a group, where Brewer may have been present, that she hoped Pioneer–Hungary would never report back to Central Europe. (Id.) Engstrand also asked Fagét about the proposed changes. (Id.)

In Bangkok, Engstrand suggested a new idea to Fagét: Pioneer could establish a philanthropic foundation to obtain public funds to make grants to eastern European farmers, enabling them to buy seed. Fagét asked Engstrand to develop a plan, funding sources, and structure for the foundation. He agreed that if the idea became viable, Engstrand would direct the foundation and report to him. In the meantime, she would continue as General Manager of Pioneer–Hungary.

On December 20, 1991, Fagét and Engstrand met in Paris. Engstrand claims Fagét offered her a second five-year assignment in Europe as director of the proposed foundation, and she accepted.

In February 1992, Brewer began his duties as Director of Central Europe and as Engstrand's supervisor. Some Pioneer employees felt Brewer, a Vietnam veteran, exhibited a militaristic management approach and was "insensitive," "harsh," "short-tempered," and "erratic and irrational." (Porter Dep. at 107.[1]) (Sehgal Dep. at ¶ 8.[2]) Nothing in the record indicates these employees communicated their opinions to Engstrand before she was discharged. Neither Sehgal nor Porter worked for Brewer during the events at issue

1. Ross Porter worked as legal counsel for Pioneer in Europe.

2. Dr. Suri Sehgal is a former vice-president of Pioneer.

in this case. Neither is presently employed by Pioneer.

Engstrand stated she and Brewer had different management styles, Brewer was harsh and unpleasant to work with, and he sometimes completely denigrated anyone who made a mistake. (Pl.'s Stmt. Facts at 7.) Brewer grew critical of Engstrand's performance.

In February 1992, Brewer came to Budapest, where he and Engstrand met for the second time. Engstrand stated Brewer told her in an "aggressive" and "louder than ... normal" tone that he "was in control ... that he'd give the orders and he'd make the decisions." (Engstrand Dep. at 229:1–3.) Engstrand found the tone of Brewer's statements objectionable.

Engstrand told Brewer she was moving to a new position with the foundation in the near future and she was merely "holding everything in a row for him until he decided who he wanted to replace" her. (Engstrand Dep. at 229:20–25.)

Tension grew between Brewer and Engstrand. Brewer ordered Engstrand to report only to him, not to Fagét, regarding Pioneer–Hungary.

On May 11, 1992, Shonsey and Fagét informed Engstrand that Pioneer had decided not to pursue development of the foundation as she had envisioned it. Pioneer, however, wanted to explore the possibility of starting a similar enterprise, a self-funded commercial-market-development program. Engstrand worked on the idea and planned to move eventually to Vienna to direct the program. The proposed program was never instituted.

On May 26, 1992, Brewer and Engstrand met for the third time. Brewer listed inadequacies in Engstrand's performance. Brewer thought Engstrand failed to actively participate in a meeting organized by Brewer on establishing a production organization in Hungary; she reported she had secured licensing agreements with fourteen Hungarian seed companies, although one company, Gabonomag, had altered the agreement; she did not prepare a report Brewer had requested about a trip she had taken; she failed to contact the Hungarian Ministry of Agriculture after the ministry expressed concern about the use of Pioneer maize hybrid in Hungary; she hired an accounting firm without Brewer's approval, contrary to his instructions; and she did not attend an important national meeting on hybrid corporations.

Near the meeting's end, Engstrand claims Brewer became "very aggressive" and said that if she did not obey his orders, "he was going to do things to [her] he didn't like to do to people." (Engstrand Dep. at 275:20–24.) According to Engstrand, Brewer threw four or five sheets of paper at Engstrand in anger. Brewer was close to Engstrand's face, his teeth were clenched, "he had white stuff in the corners of his mouth," his "face and neck were red," and his "fists came up in front of [her] face." (*Id.* at 275–76.) They never made physical contact.

Brewer told Fagét about his meeting with Engstrand in an electronically transmitted message, which included the following statements:

> André, I did not press these issues with Lynn since she is already a lame-duck General Manager, and it is obvious that her attitude is that the management of our business in Hungary is no longer her primary concern, but it really is essential to move her as soon as possible. Please help me do this.

(Def.'s Ex. 50.)

After the May 26 meeting, Engstrand sent a message to Brewer in response to his complaints. She explained the circumstances surrounding the actions he criticized, noted she had done some of the work as specified, and stated she and her team had worked around the clock since February to stabilize Pioneer's presence in Hungary. Engstrand's message ended as follows:

> In view of your statements that due to the above and my poor performance in Hungary you will not be able to trust me, I believe it best that André [Fagét] relieve me of my responsibility here as soon as possible. I make this request notwithstanding the fact that I had offered to overlap with the new [General Manager].

(Def.Ex. 51.)

Engstrand sent a copy of the message to Fagét. Brewer replied quickly, denying a

lack of trust in Engstrand and stating he only wished she would follow his orders. He added: "However, by addressing your complaint to André rather than to me, you have crossed a line I am not willing to tolerate." (Def.'s Ex. 52.) He told her to come to Parndorf, Austria, on May 27, 1992, to meet with him.

Engstrand responded that she could not meet Brewer on May 27, because she had made plans to leave town. Brewer transmitted another message to her: He found Engstrand's reason for not meeting with him unacceptable; unless Engstrand's travel plans were an emergency, she was to report to Parndorf "now." (Def.'s Ex. 54.)

Engstrand communicated with Fagét about her problems with Brewer. She told Fagét she wanted to report to him, not to Brewer. Fagét told Engstrand she had "started a war" in Central Europe that she would have to settle herself.

Brewer communicated with Fagét about the possibility of firing Engstrand. Fagét gave Brewer full authority to make such a decision. On May 27, 1992, Engstrand met Brewer in Parndorf, and Brewer discharged her. According to Engstrand, Brewer said he was firing her "for crossing that line with André." (Engstrand Dep. at 358:9–10.)

Engstrand received no severance package. Mark Dickey, a male younger[3] than Engstrand, replaced her as General Manager of Hungary. Dickey had started production for Pioneer in Hungary in 1981.

## II. DISCUSSION

### A. Standards for Summary Judgment

A court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91

L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); Aucutt v. Six Flags Over Mid–America, Inc., 85 F.3d 1311, 1315 (8th Cir.1996). A party seeking to defeat a motion for summary judgment must set forth specific facts showing the existence of a genuine material issue that requires a trial. Roxas v. Presentation College, 90 F.3d 310, 314–15 (8th Cir.1996). No genuine issue for trial exists where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although direct proof is not required to create a jury question, "to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Rouse v. Farmers State Bank of Jewell, Iowa, 866 F.Supp. 1191, 1207 (N.D.Iowa 1994). Mere speculation "does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th Cir.1995) (emphasis in original), cited with approval in Miller v. Nat'l Cas. Co., 61 F.3d 627, 630 (8th Cir.1995).

The court must consider all facts in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356; Roxas, 90 F.3d at 314–15; Aucutt, 85 F.3d at 1315; Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir.1993). The court is not, however, required to ignore undisputed evidence in the record that supports the motion. Aucutt, 85 F.3d at 1315.

### B. Federal Gender and Age Discrimination Claim

■ Engstrand claims her termination constituted discrimination on the basis of gender in violation of Title VII, and on the basis of age in violation of the ADEA.[4] To

---

3. The record does not indicate Dickey's age.

4. Engstrand asserts her termination also constituted discrimination under Iowa Code Chapter

216. Generally, Iowa courts have held that the state's civil rights statutes, including Chapter 216, are "patterned after Title VII." Brine v.

prove each claim, she relies on the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[5] The *McDonnell Douglas* analysis arose in the context of Title VII, and this court will apply it to claims arising under the ADEA. *Roxas*, 90 F.3d at 314–15; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995).[6]

First, a plaintiff must establish a prima facie case of discrimination, which creates a presumption that the employer unlawfully discriminated against the employee. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Parrish v. Immanuel Medical Ctr.*, 92 F.3d 727, 732–33 (8th Cir.1996); *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir.1996).

To show a prima facie case of discrimination in termination under Title VII or ADEA, a plaintiff must show the following: 1) that she is a member of a protected class; 2) that she was qualified for her position and satisfied its normal requirements; 3) that she was discharged; and 4) that the discharge occurred under circumstances that create an inference of unlawful discrimination.[7] *See Hopper v. Hallmark Cards, Inc.*, 87 F.3d 983, 988 (8th Cir.1996); *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir.1994).

If a plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the employment decision. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Roxas*, 90 F.3d at 315–16; *Rothmeier*, 85 F.3d at 1332. If the defendant carries this burden, the presumption raised by the prima facie case is rebutted and drops from the case, and the burden of production shifts back to the plaintiff to

*Univ. of Iowa*, 90 F.3d 271 (8th Cir.1996). Iowa courts characterize federal case law on Title VII as "instructive." *Id.*; *see Rouse*, 866 F.Supp. at 1214; *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 893 (Iowa 1990); *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989). For reasons cited below, however, the court dismisses this claim.

5. A trial court must determine whether a case should be analyzed as either a "pretext" case under *McDonnell Douglas* or a "mixed-motives" case under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *Id.* at 247 n. 12, 109 S.Ct. at 1789 n. 12. Under *Price Waterhouse*, the plaintiff has the threshold burden of showing "that an illegitimate criterion was a motivating factor in the employer's decision to terminate her employment." *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 471 (8th Cir.1995). To make the threshold showing of illegitimate criterion, a plaintiff must set forth "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision [to terminate]." *Cram*, 49 F.3d at 471. If the plaintiff cannot meet this burden, she can prevail only if she shows the employer's stated reason for its decision is a pretext for discrimination. *Price Waterhouse*, 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12.

As discussed, *infra*, no evidence shows Engstrand's termination was based on a discriminatory attitude toward women or toward her on account of her age. As a matter of law, Engstrand thus has not made the threshold showing

required to obtain a mixed-motives analysis of her case under *Price Waterhouse*. The court therefore agrees that her case must be analyzed under *McDonnell Douglas*.

6. The United States Supreme Court has not yet had occasion to decide whether *McDonnell Douglas's* basic evidentiary framework applies to claims of age discrimination brought under the ADEA. *O'Connor v. Consol. Coin Caterers*, —— U.S. ——, ——, 116 S.Ct. 1307, 1308–10, 134 L.Ed.2d 433, 438 (1996) (assuming framework applies to claim under ADEA, since parties did not contest the point).

7. For a prima facie case of age discrimination, the fourth prong was recently modified by the United States Supreme Court in *O'Connor*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433. *Hopper*, 87 F.3d at 988 n. 5. Courts may no longer require a plaintiff to show replacement by a worker outside the protected class, i.e., under 40 years old. *Id.* The fact "that a replacement is *substantially* younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor*, —— U.S. at ——, 116 S.Ct. at 1310, 134 L.Ed.2d at 439. (Emphasis added.) This standard avoids the problem of "creating a prima facie case on the basis of very thin evidence—for example, the replacement of a 68 year-old by a 65 year-old" or "a 40 year-old replaced by a 39 year-old" by recognizing that the prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Id.* at ——, 116 S.Ct. at 1310, 134 L.Ed.2d at 439.

show the proffered reason is actually a pretext for discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Parrish,* 92 F.3d at 732–33; *Roxas,* 90 F.3d at 315–16; *Rothmeier,* 85 F.3d at 1332.

Contrary to Engstrand's assertion, a court's analysis does not end if a plaintiff successfully demonstrates pretext. Proof that the defendant's explanation is pretextual does not, without more, entitle the plaintiff to judgment; the plaintiff must show both that the explanation is a pretext and that discrimination is the true explanation. *Roxas,* 90 F.3d at 316 & n. 3; *Rothmeier,* 85 F.3d at 1335; *O'Bryan v. KTIV Television,* 64 F.3d 1188, 1192 (8th Cir.1995) ("[P]laintiff's proof of pretext, with respect to the defendant's proffered reason for its actions, is relevant to, but not dispositive of, the ultimate issue of intentional discrimination."); *Krenik,* 47 F.3d at 958. The plaintiff "at all times carries the burden of persuasion to show that the [termination] was motivated by intentional discrimination." *Roxas,* 90 F.3d at 316.

Viewing all evidence in the light most favorable to Engstrand, the court determines that she has established a prima facie case for both her ADEA and her Title VII claims, because she is a woman in the protected age category, she was qualified for her position, she was fired, and she was replaced by a younger man.[8]

■ The burden of production shifts to Pioneer to proffer a legitimate, non-discriminatory reason for Engstrand's discharge.

Pioneer's evidence shows Fagét and Brewer were dissatisfied with Engstrand's job performance. Several specific areas of deficiency are set forth in Pioneer's answers to interrogatories and in Fagét's deposition. These specific areas essentially encompass the performance criticisms outlined by Brewer in his communications to Engstrand and Fagét. Pioneer notes that Engstrand and Brewer had a poor working relationship. Pioneer submits that Brewer was frustrated by Engstrand's perceived failure to follow his instructions. Pioneer's evidence shows Engstrand asked to be removed from the position of General Manager of Pioneer–Hungary. The court determines that Pioneer's proffered reasons are legitimate and nondiscriminatory and thus rebut the presumption raised by the prima facie case.

■ The burden shifts back to Engstrand to provide evidence both that Pioneer's proffered explanation is a pretext and that discrimination was the true explanation. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Roxas,* 90 F.3d at 316–17; *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 777 (8th Cir.1995). She cannot meet her burden merely by showing Pioneer's reasons were false. She must show a discriminatory animus underlies Pioneer's explanations. *See Roxas,* 90 F.3d at 316–17.

Engstrand offers the following evidence, in addition to her prima facie case, to meet her burden.

### 1. Discriminatory Statements by Supervisor

■ First, Engstrand offers a purported affidavit from Eva Kropil, a woman who had worked for Brewer at Pioneer.[9] Engstrand asserts the statement contains comments by Brewer that raise a material issue of fact

---

**8.** The record does not indicate the age of Mark Dickey, Engstrand's replacement. It is unclear whether Dickey was "substantially" younger than Engstrand. *See O'Connor,* —— U.S. at ——, 116 S.Ct. at 1310, 134 L.Ed.2d at 439. Nevertheless, for purposes of this motion, the court assumes Engstrand has satisfied her burden of production on the fourth prong of the prima facie case for her ADEA claim.

**9.** Pioneer objects to the untimeliness and use as evidence of Kropil's statement.

When evaluating evidence relevant to a motion for summary judgment, a court may not consider affidavits that fail to satisfy the requirements of Fed.R.Civ.P. 56(e). *Aucutt,* 85 F.3d at 1315.

The statement does not meet the requirements for an affidavit stated in Rule 56(e), because the statement was not made under oath.

Furthermore, Engstrand offered the statement on the eve of the hearing on the Motion for Summary Judgment. Although Engstrand told the court she would provide an affidavit from Kropil, she has not done so.

Because of its holding concerning the statement's contents, however, the court need not address the issue of the statement's untimeliness and invalidity as an affidavit.

about Brewer's discriminatory intent when he discharged Engstrand.

In her statement, Kropil said: "Brewer—in the absence of Lynn Engstrand—named Lynn Engstrand an 'old and ugly woman' and called her 'stupid.'" (Suppl. Pl.'s Desig.App. at 000326.) Nothing in the record indicates when, where, or under what circumstances these comments were purportedly made. The record is silent as to when Kropil worked for Brewer.

■ Under certain circumstances, a supervisor's discriminatory statements may be evidence of discriminatory intent. *Ruby v. Springfield R–12 Public School Dist.,* 76 F.3d 909, 912 (8th Cir.1996); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 512 (8th Cir.1995). The Eighth Circuit distinguishes comments that show a "discriminatory animus in the decisional process" from "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decisional process." *Aucutt,* 85 F.3d at 1315–16.

■ Statements that constitute "the functional equivalent of a stray remark" do not give rise to a reasonable inference of discrimination. *McLaughlin,* 50 F.3d at 512; *see Bashara v. Black Hills Corp.,* 26 F.3d 820, 824 (8th Cir.1994). Thus, when assessing the ultimate issue of intentional discrimination, the court may properly disregard any stray remarks made by the decisionmaker but not causally related to the decisionmaking process. *Aucutt,* 85 F.3d at 1315–16; *Hutson,* 63 F.3d at 779; *Frieze v. Boatmen's Bank of Belton,* 950 F.2d 538, 541 (8th Cir. 1991); *see Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804–05.

Reasonable minds could not infer from Brewer's alleged comments that his decision to discharge Engstrand was motivated by a stereotypical belief that productivity and competence decline with old age, *Parrish,* 92 F.3d at 733–34 (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)), or that women are less satisfactory employees than men, *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 472 (8th Cir.1995), or ascribing his difficulties with Engstrand to the fact she was a woman, *Id.* At most, the statements imply a personal dislike or distrust of Engstrand, but such comments "are not the same as statements found to imply discriminatory attitudes." *Id.*

Even assuming these comments were made at or near the time of Engstrand's termination, the comments do not rise above the level of "stray remarks" and do not give rise to a reasonable inference of discrimination. *See Ruby,* 76 F.3d at 912.[10]

*2. Shifting Reasons for Termination*

■ Next, Engstrand makes much of the fact that Pioneer amended its answers to interrogatories, changing some of its asserted reasons for discharging Engstrand. She claims these changes represent inconsistencies in reasons offered by Pioneer for Engstrand's discharge and are evidence that the reasons are a pretext for gender or age discrimination.

Engstrand relies on *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994) to support her argument. In *Ethan Allen,* defense witnesses at trial stated reasons for plaintiff's discharge that were inconsistent with the reasons defendant gave earlier in discovery. Defendant's witnesses testified the plaintiff was terminated because the person replacing him was better qualified. *Id.* During discovery, however, defendant stated that the "*sole* reason for [plaintiff's] discharge was a decrease in the duties of his ... position." *Id.* (Emphasis added). Defendant changed its position after the investigator learned that another employee now performed the same tasks previously assigned to plaintiff. *Id.* The court reversed the granting of defendant's motion for summary judgment.

---

**10.** Similarly, based solely on Fagét's inquiry about Engstrand's age during her job interview, no reasonable factfinder could find that even if Fagét took part in the decision to discharge her, his stated reasons for the decision were a pretext for discrimination. Fagét hired Engstrand when she was 55 years old, 18 months before she was terminated. *See Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 175 (8th Cir.1992) (reasoning it was incredible, in light of weakness of plaintiff's other evidence, to believe company officials who hired him when he was 51 years old suddenly developed aversion to older people less than two years later).

Engstrand's evidence does not meet her burden. Here, unlike in *Ethan Allen,* no stark contradiction exists in the employer's proffered reasons. *Ethan Allen* involved more than mere minor discrepancies between original and amended answers to interrogatories, which is the evidence Engstrand provides.

Pioneer's first and amended answers to interrogatories are substantially similar. Of the 23 reasons listed for Engstrand's dismissal in Pioneer's first answers, 16 remain and are encompassed in the scope of the amended answers. (Pl.'s App. at 19–22.) The remaining seven[11] are either still proposed as justifications for Engstrand's termination, although not specifically listed in the second set of answers, or are not inconsistent with the later stated reasons for the discharge.

The first set of interrogatories were completed when Pioneer was represented by counsel other than its current counsel. That Pioneer, at opposing counsel's request and in accordance with its duties under Rule 26(e) of the Federal Rules of Civil Procedure, narrowed its grounds as trial approached, does not create a genuine dispute about Pioneer's motives, especially in view of the paucity of any evidence in the record that creates an inference of discriminatory animus. Engstrand does not meet her burden.

### 3. Supervisor's Offensive Conduct

■■■ Engstrand contends the real reason Brewer fired her was his discriminatory animus, as evidenced by his abrupt and abrasive, even allegedly threatening and assaultive, manner of discharging her. Specifically, she states he "flew into an unwarranted rage." (Pl.'s Resp. Br. at 11.)

■■■ Evidence in the record shows that Brewer's management style was generally abrasive and offensive. This evidence coupled with Engstrand's account of Brewer's manner of firing her does not support a reasonable inference that Brewer treated Engstrand any better or worse than males or younger employees. An employer's offensive or irrational conduct, without more, is insufficient to establish a discriminatory animus. *See Porras v. Montefiore Medical Ctr.,* 742 F.Supp. 120, 127 (S.D.N.Y.1990); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) (The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved.); *accord Quick v. Donaldson,* 90 F.3d 1372, 1378–79 (8th Cir.1996).

The evidence supports a reasonable inference that Brewer's abrasive style led to a clash with Engstrand, and that within three months of his becoming her supervisor Engstrand was discharged. The court finds that Engstrand's evidence does not create a reasonable inference that Pioneer's reasons were really a pretext for unlawful discrimination; she does not meet her burden of production.

### 4. Sudden Decision to Discharge

■■■ Engstrand next claims Brewer fired her suddenly in anger, which is evidence the business reasons given by Pioneer for the decision were a pretext for discrimination.

■■■ Under certain circumstances, an employer's cursory manner in discharging an employee may be evidence of pretext for an improper reason. *See, e.g., Hardin v. Hussmann Corp.,* 45 F.3d 262, 265–66 (8th Cir. 1995) (holding employer's reliance on incomplete research and failure to consider other employees for discharge raised material issue of fact whether stated reasons for discharging plaintiff were pretext for discrimination in reduction-in-force case); *Fink v. Kitzman,* 881 F.Supp. 1347, 1365–66 (N.D.Iowa 1995) (holding cursory method of discharge raised material issue of fact on question of whether defendant's proffered legitimate reason, reduction in force, was pretextual).

This case is distinguishable from *Hardin* and *Fink;* Pioneer does not allege it dis-

---

**11.** These seven reasons include the following: Engstrand's refusal to take Brewer's calls after he demanded she come to Vienna; her request to be removed from her position as General Manager and moved to the proposed foundation position; her failure to learn Hungarian, to create a database of customers, and to develop a training program for distributors; a decrease in profits; and Pioneer's inability to offer Engstrand a foundation position because of lack of work.

charged Engstrand as part of a reduction in force. Moreover, the evidence shows Brewer's decision, although it may have appeared to Engstrand to be made suddenly, came only after Brewer consulted with Fagét and was assured he had the authority to fire Engstrand. Further, the record shows tension between Engstrand and Brewer existed long before the day Engstrand was discharged. Brewer described for Engstrand in detail his dissatisfaction with her work performance, and she responded in writing to his criticisms.

The court finds Engstrand's evidence of discriminatory animus based upon an abrupt discharge is speculative and insufficient to meet her burden.

### 5. Disparate Treatment

As evidence that Pioneer's proffered reasons were a pretext for unlawful discrimination, Engstrand next alleges that Pioneer treated her differently from male employees in respect to company policies regarding open communication with supervisors; opportunity for performance evaluations, salary negotiations or other consultations with supervisors; and receipt of benefits upon termination.

■ Where a plaintiff bases her pretext argument on a comparison of employees, she must show that employees are "similarly situated in all relevant aspects." *Hutson*, 63 F.3d at 777.

■ Employers have wide latitude to make business decisions. *McLaughlin*, 50 F.3d at 511–12 ("[A]n employer has the right to ... assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge—for good reason, bad reason, or no reason at all, absent intentional ... discrimination."); *see Stemmons v. Missouri Dep't of Corrections*, 82 F.3d 817, 819 (8th Cir.1996). Absent intentional discrimination by employers, federal courts may not sit as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers." *Hopper*, 87 F.3d at 988 (quoting *Hutson*, 63 F.3d at 781).

### a. Communication with Supervisors

■ Engstrand alleges that Pioneer has a policy to give all employees an opportunity for open communication with superiors, and that this policy was applied differently to her than to male employees, in that she was fired when she tried to communicate with Fagét.

As evidence of this policy, Engstrand cites Pioneer's "Manager's Guide to Policies & Procedures." As noted above, however, the guide applies only to "full-time regular employees of Pioneer in the U.S."

■ Furthermore, Engstrand has not shown she was similarly situated to any male employees who were allegedly treated differently than she was with regard to communication with superiors. She offers no evidence other than mere speculation to show Pioneer treated male employees outside the United States differently than they treated her with respect to this policy. Mere speculation is insufficient to support a reasonable inference of pretext or discrimination. *See Hopper*, 87 F.3d at 988 ("Although we must give [plaintiff] the benefit of all reasonable inferences, we may not accord him 'the benefit of unreasonable inferences.' A reasonable inference is one 'which may be drawn without resort to speculation.' ").

The record shows Engstrand had ample opportunity to communicate with her immediate supervisor, Brewer.

Even if Pioneer could have done a better job of providing Engstrand with opportunities to communicate with supervisors, no evidence shows the company's actions were unreasonable. The court finds the evidence Engstrand offers to meet her burden falls far short of the mark. *See Roxas*, 90 F.3d at 316–17; *Goetz v. Farm Credit Services*, 927 F.2d 398, 402–03 (8th Cir.1991).

### b. Performance Evaluations

■ Engstrand next asserts that Pioneer treated her differently than male employees, in that the company allegedly failed to provide her a formal performance evaluation comparable to those given to her male peers, thereby depriving her of an opportunity to negotiate her salary and bonus.

In her affidavit, Engstrand alleges that at a meeting in December 1991, Fagét evaluated the job performance of male general managers, but did not evaluate her job performance, and therefore she missed the opportunity to negotiate a salary increase or bonus. Engstrand, however, offers no evidence beyond speculation that the males received performance evaluations during their meeting with Fagét. In her deposition, she stated she was not present in the room and did not know what Fagét discussed with the male general managers. (Suppl. Pl.'s Desig.App. at 00401.) She concludes Fagét met with the men "to do some kind of evaluation." (*Id.*) She does not specify with how many male general managers Fagét met, who they were, or whether the alleged evaluations were written.

Fagét testified his method for employee evaluation involved asking employees to set goals and assess their progress in accomplishing those goals. The record shows Fagét gave Engstrand the opportunity to set goals for Pioneer–Hungary, and she did so. (Def.'s Ex. 121.) In a written report, she assessed her progress in achieving those goals. (Def.'s Ex. 119.)

As evidence of evaluations provided to male employees, Engstrand submitted the following exhibits: a 1988 evaluation of Mark Dickey, written when Dickey was a research and trial manager; a 1988 evaluation of Brewer, prepared when he was European Operations Director; and a 1992 Management Tracking Report, which listed performance strengths and weaknesses of four general, country, or acting managers of various countries, the President of Pioneer in Japan, the Asia–Pacific Regional Controller, and a Regional Technical and Agronomic Support Services Manager.

Dickey and Brewer were not similarly situated to Engstrand; their positions were at different levels than hers, and the evaluations were written by supervisors different than hers. The evaluations were made years before Engstrand worked for Pioneer.

Similarly, the Management Tracking Report was prepared for Shonsey, a supervisor other than Engstrand's. Nothing in the record indicates the use for which the report was intended. The report may or may not have been discussed with the employees whose performances were evaluated.

Engstrand claims she received a smaller bonus than her male counterparts. She offers, however, no evidence beyond speculation to substantiate the claim. Nor does she show that male employees who allegedly received larger bonuses than she received had the same supervisor, worked for Pioneer the same length of time as she, were promised specific bonus amounts, or were otherwise similarly situated to her in all relevant respects.

Fagét testified he generally provided bonuses in the 13 to 25 percent range. He stated he gave Engstrand a bonus lower than a 25 percent bonus because in his judgment she had not accomplished her goals.

Even if Pioneer could have done a better job of providing Engstrand with job performance evaluations, no evidence shows the company's actions were unreasonable. Once again, the court finds the evidence Engstrand offers to meet her burden falls short of the mark.

### c. Severance Benefits

■ Engstrand alleges that unlike discharged male employees, she did not receive a termination package providing her certain benefits. She offers evidence concerning two male employees—Brewer and Gerhard Lopata, Director of Central Europe—to support this claim.

Brewer's situation was dissimilar to Engstrand's. The record indicates Brewer's position was higher in the corporate structure than Engstrand's. Brewer worked for Pioneer for 13 years, and Pioneer allowed him to resign, rather than summarily discharging him. By comparison, Engstrand worked for Pioneer for only a year and a half before her discharge.

Engstrand supports her claim that Lopata received a severance package with a one-page document, "Calculation for Leaving Payments Gerhard Lopata." (Pl.'s Suppl. App. at 7001434.) The document is unsigned and undated. The document offers no evidence of the final terms governing Lopata's

severance; it lists only proposed terms under the following headings: 1) "We fire him (no mutual agreement)," or 2) "Possible Mutual Agreements." *Id.* Any inference drawn from this document would be speculative.

Three times the document refers to Lopata's employment contract. Engstrand, unlike Lopata, had no contract; she was an at-will employee.

Brewer and Lopata are not similarly situated to Engstrand in all relevant aspects. Engstrand's evidence concerning severance packages given to males is speculative and does not support a reasonable inference that Engstrand was treated differently than similarly situated males. Engstrand has not met her burden to show pretext and unlawful discrimination.

Engstrand offers scant evidence, barely more than her subjective belief and speculation, to support her claim of disparate treatment in regards to consultations with supervisors, performance evaluations, and receipt of benefits upon termination. Even viewing the evidence in the light most favorable to Engstrand, the court holds this evidence is insufficient to meet her burden of showing Pioneer's proffered reason for her discharge were pretext for unlawful discrimination.

### 6. *Expert's Opinion*

 Finally, as evidence of discriminatory animus, Engstrand offers the opinion of her expert, Paul Muchinsky, Ph.D, a licensed professional psychologist.[12] Muchinsky stated, "this case presents classic sex discrimination." (Suppl.Pl.'s Desig.App. at 00376.) Muchinsky determined that if Engstrand was fired unfairly, "[s]ex discrimination (particularly when coupled with age discrimination) is the most likely candidate" for the cause. (*Id.* at 00383.)

He based his conclusion on the observation that organizations such as Pioneer "tend to be populated by male employees, particularly at the scientific and managerial levels." (*Id.* at 00376.) Such organizations also "tend to be somewhat ignorant and often derelict in directing the human aspects of running a business," and Pioneer probably "had little

experience in dealing with female employees at the level [Engstrand] held." (*Id.* at 00377, 00383.)

In regards to Engstrand's confrontation with Brewer during their meeting May 26, 1992, Muchinsky stated, "there was nothing of a sexual nature to their exchange...." (*Id.* at 000384.) Engstrand argues, however, that "there are numerous organizations which regard across-gender intimidation as a form of sexual harassment." (Pl.'s Stmt. Facts at 18.) The court notes Engstrand has made no claim based on sexual harassment.

Muchinsky states Brewer "had little patience for dealing with a woman who did not show deference to him." (Suppl.Pl.'s Desig.App. at 00383.) He based this opinion on the "large amount of psychological literature" that supports the proposition that "characteristics of assertiveness and conviction are regarded as 'qualities' in men, but unacceptable traits in women." (*Id.*) He surmised Brewer had "relatively poor people skills in general," and was the "typical 'technical expert' who probably is relatively inept in dealing with interpersonal issues in business (and perhaps personally), and [Engstrand] just happened to be in his range at this time." (*Id.*)

Muchinsky speculated it was "wholly consistent with Brewer's demeanor" to resort to confrontational intimidation, including nonverbal as well as verbal communication. He based his speculation on the observation that Brewer "refers to [Engstrand's] actions as 'starting a war in Central Europe,'" and that he is thus prone to hyperbole and exaggeration. (*Id.* at 00384.) The court notes, however, the record shows it was Fagét, not Brewer, who characterized Engstrand's actions as "starting a war" in Central Europe. (Pl.'s Stmnt. Facts at 9.)

Without making a credibility determination, the court notes Muchinsky's opinions, by his own admission, are speculative. Furthermore, his opinions, even assuming their validity, about tendencies in organizations such as Pioneer are irrelevant to the facts at issue in this case. Conclusory allegations about the industry at-large are insufficient to

---

**12.** Muchinsky is a professor who teaches in the area of human resource management and organizational behavior. (Suppl.Pl.'s Desig.App. at 00375.)

create a genuine dispute regarding whether gender or age discrimination actually played a role in Engstrand's termination. Muchinsky's opinion does not support Engstrand's discrimination claims.

Engstrand has not provided any evidence that would create a genuine issue of material fact that Pioneer's proffered reasons for discharging her were a pretext for unlawful discrimination. The facts and circumstances Engstrand relies upon never rise above a speculation about discrimination. As in *Hedberg* and *Rouse,* her mere speculation creates only false issues.

The only reasonable inference to be drawn in this case is that Engstrand did not get along with her new boss. She was an at-will employee. Brewer fired her. Engstrand may have created a factual dispute regarding whether or not she was treated respectfully, but the court's concern is whether she raised a genuine issue of material fact that Brewer or Fagét acted in a discriminatory fashion.[13]

Because Engstrand has not created a genuine issue of material fact on the issue of whether the reasons Pioneer gave for her discharge were a pretext for unlawful discrimination, the court dismisses her claims under Title VII and the ADEA.

### C. State Claims

Along with her federal gender and age discrimination claims, Engstrand also brings a host of state claims. She alleges statutory claims of age and gender discrimination based on Iowa Code Chapter 216 and common law claims of assault, negligent retention/hiring, and promissory estoppel. In response to Pioneer's Motion for Summary Judgment, Engstrand specifically declined to resist the motion as to her claims for breach of contract (Count VI) and fraudulent misrepresentation (Count VIII), thereby in effect moving the court to dismiss those claims.

The court declines to exercise supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(c)(3). The state claims are, therefore, dismissed without prejudice.

### III. CONCLUSION

Defendant's Motion for Summary Judgment on Counts I and II (federal gender and age discrimination claims) is granted. Plaintiff failed to create a genuine issue of material fact suggesting that Defendant's proffered reasons for discharging her were pretext for age or gender discrimination. On plaintiff's motion, Counts VI (breach of contract) and VIII (fraudulent misrepresentation) are dismissed. All remaining state claims (Counts III, IV, V, VII) are dismissed without prejudice.

IT IS SO ORDERED.

---

13. This case is distinguished from *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264 (8th Cir. 1993). In *Kopp,* defendant moved for summary judgment arguing, much like Pioneer here, that the alleged discriminator was abusive to all employees, male or female, when the employees made mistakes. The court reversed the lower court's grant of the motion, because plaintiff offered proof the incidents involving the alleged discriminator "primarily" involved women and that incidents with women were "of a more

serious nature than those involving male employees." *Id.* at 269.

Engstrand does not allege or offer any proof that Brewer's abrasive behavior was directed primarily at women, or even at any woman other than herself. Indeed, her argument that Pioneer is "male-dominated," combined with all the testimony regarding Brewer's reputation for having an abrasive and harsh management style, supports the inference that Brewer was abusive primarily to men.