Lee KOPP, Appellant,

v.

SAMARITAN HEALTH SYSTEM, INC., and Saadi Albaghdadi, Appellees.

No. 93–1519.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1993.

Decided Dec. 23, 1993.

Rehearing Denied Jan. 21, 1994.

Dorothy A. O'Brien, Davenport, IA, argued, for appellant.

Margaret Chaplinsky, Des Moines, IA, argued, for appellee Samaritan Health System.

Before RICHARD S. ARNOLD, Chief Judge, BEAM, Circuit Judge, and BOGUE,* Senior District Judge.

RICHARD S. ARNOLD, Chief Judge.

The plaintiff, Ms. Lee Kopp, appeals the District Court's order granting summary judgment to the defendants, Dr. Saadi Albaghdadi and Samaritan Health System. Kopp contends that Albaghdadi's behavior towards her, coupled with the hospital's failure sufficiently to curtail his conduct, amounted to hostile-environment sexual harassment under Title VII, 42 U.S.C. § 2000e–2(a)(1). The District Court held that the evidence was not sufficient to sustain a finding that Albaghdadi's alleged abuse of Kopp was gender-based. We disagree, and we now reverse.

---

* The Hon. Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

## I.

We state the facts in the light most favorable to the party who lost below, as is appropriate on review of a summary judgment. Lee Kopp works for Samaritan Health System. She has worked for Samaritan (and its predecessors) for 15 years in the respiratory-cardiology department, and now is the lead cardiology technician. This position normally includes supervisory duties at two separate Samaritan sites, referred to as north and south campus. Throughout her employment, Kopp has consistently received "excellent" evaluations, and her supervisors consider her to be a dedicated employee.

Samaritan Health System is the corporate successor to Gateway Health Systems, which owned Jane Lamb Hospital. In 1989, Jane Lamb and Mercy Hospital merged into the Samaritan Health System.

Dr. Saadi Albaghdadi is a cardiologist with hospital privileges at Samaritan. Prior to the merger, he held privileges at both hospitals. Albaghdadi served on the executive committee of the medical staff throughout the early 1980s and has chaired several other Samaritan medical committees. He is present at Samaritan on a daily basis. In addition to his patient responsibilities, he directs hospital staff, orders them to perform tests, disciplines them when procedures fail to meet his expectations, and works in close physical contact with them. Although Albaghdadi does not have the power to hire or fire Samaritan employees, Samaritan has, at times, rearranged the location of staff members to accommodate Albaghdadi's wishes. The hospital has also changed certain staff members' schedules at his request, and has added staff in response to Albaghdadi's demands. On occasion, Albaghdadi has obtained money from the hospital for additional training for Kopp and other cardiology staff members. Moreover, the hospital has changed its supply orders to accommodate the doctor's requests. Albaghdadi generates considerable revenue for the hospital (approximately four million dollars in 1990) and is a partner in a clinic which leases an expensive piece of equipment to the hospital. From this piece of equipment alone, Albaghdadi's partnership earns $10,000 in monthly rent.

Kopp used to work with Albaghdadi on a regular basis, and has had several encounters with him. On two occasions Albaghdadi shouted at Kopp. Once, he yelled and threw his stethoscope at her, because another doctor had transferred a patient before Albaghdadi could collect a fee. This behavior reduced Kopp to tears. Then, on February 1, 1991, Albaghdadi reviewed a patient's chart and noticed that an echocardiogram report was missing. He telephoned Kopp and angrily demanded to know why the report was missing. She replied that she did not know, but that she would try to find out. Before hanging up, Albaghdadi referred to Kathy McAllister, who runs Samaritan's medical records department, as "that stupid bitch."

Fifteen minutes or so later, Kopp came across McAllister and Albaghdadi in the hallway. Albaghdadi attempted to secure a commitment from Kopp on a turnaround time for all echocardiogram reports to be typed and attached to patient charts. Although Kopp attempted to address Albaghdadi's concerns, she stated that she could not make a commitment about an exact turnaround time, because people over whom she had no control were involved in the process.

At this point, Albaghdadi became enraged and grabbed Lee Kopp with both hands by the lapels of her scrub jacket. He also grabbed her bra straps and her skin. He pulled her close and shouted through gritted teeth, "I want to know who to come after when this happens again." He held onto her and shook her for approximately 30 seconds, then he released her and pushed her back. He also complained about the merger that created Samaritan, referred to Ron Reed, an officer of Samaritan, as a "goddamn bastard," and complained about the condition of the wallpaper.

That evening, Kopp contacted her supervisor, Bill Vogel, to tell him about the incident. On February 4, she met with Samaritan administration members to discuss what had happened and, on February 6, she filed a formal complaint. Hospital officials met with Albaghdadi, and he emphatically denied ever touching Kopp.

On February 10, 1991, Dr. George York, president of Samaritan's medical staff, telephoned Kopp to schedule a meeting between Kopp and Albaghdadi. The purpose of the meeting was for Albaghdadi to apologize for his behavior. York informed Kopp that Tom Hesselman, Samaritan's CEO, had told him to arrange the meeting. When York called Kopp the next morning to set a time for the meeting, Kopp told him that she would prefer to handle the situation through administrative channels. She also indicated that she did not feel comfortable meeting with Albaghdadi. York slammed down the phone and headed for Kopp's office. When he found her he thumped her several times on the chest, saying, "Listen little lady, there are two kinds of people in this world, peacemakers and troublemakers. I know what kind you are." Kopp ran from her office into Vogel's. York followed her and continued to shout at her. Vogel stood between Kopp and York, and, eventually, York left Vogel's office.

Albaghdadi wrote Kopp a letter in which he apologized for upsetting her, but did not admit that he had touched her. Although the hospital could have temporarily revoked Albaghdadi's privileges and initiated proceedings to do so on a permanent basis, it did not. Instead, Vogel and Samaritan's vice-president, Wayne Sensor, told Kopp that they would require Albaghdadi to take a two-week leave of absence. Hesselman wrote Albaghdadi and told him that he either had to get some counseling or take some time off. Albaghdadi responded angrily, asserting that his apology should have been sufficient. He then attended a cardiology conference for which he had registered several weeks before the February 1, 1991, incident. No one from the hospital followed up to see whether Albaghdadi actually took the required time off or how long he was away. The hospital did not investigate the York incident, nor did Kopp receive an apology from him.

In 1991, before her encounters with Albaghdadi, Kopp was head of the cardiac technicians on both the north and south campuses. Samaritan performs most of its cardiac care on the north campus. After Albaghdadi's assault on Kopp, she told Vogel that she would prefer not to work with Albaghdadi on a daily basis. The hospital's response to her concerns was to locate Kopp primarily at south campus where little cardiac care occurs. As a result of this measure, Kopp no longer supervises any activity that occurs on the north campus. Kopp has had no further workplace encounters with Albaghdadi. Although Kopp continues to receive satisfactory performance evaluations and normal pay raises, she feels as if she has been demoted. She no longer supervises work on the north campus and is not involved in cardiac employee evaluations. Further, she asserts that her skills are deteriorating from lack of use.

In addition to the changes in her job, Kopp developed several emotional and physical problems following the Albaghdadi incident. She has suffered from insomnia, nightmares, headaches, loss of appetite, aggravation of a back problem, hypervigilance, and exaggerated startle response. These symptoms reoccur whenever she has contact with Albaghdadi. For example, she experiences some of these symptoms before and after she sees Albaghdadi at depositions.

Dr. Deborah Van Speybroeck, Ph.D., a clinical psychologist, diagnosed Kopp as experiencing Post Traumatic Stress Disorder as a result of the incidents at the hospital. Van Speybroeck said that Kopp had been a victim of child abuse, and that the abuse made her more susceptible to long-term injury from violence. Kopp had no prior history of mental-health treatment, and denies having had any post-traumatic-stress symptoms prior to the Albaghdadi and York incidents. According to Van Speybroeck, Kopp's symptoms continue primarily because of the unpredictable chance that Kopp will have to interact, in potentially close quarters and/or alone, with Drs. Albaghdadi and York.

The record also contains considerable testimony from Samaritan employees recounting numerous instances of Albaghdadi shouting at, swearing at, throwing objects at, using vulgar names to refer to, and shoving female hospital employees. For example, in 1985, Albaghdadi pushed charged defibrillator paddles at Kelly Yaddoff Sterk, placing her and others in the room in danger. Sterk had not

applied the paddles to the patient immediately upon Albaghdadi's request that she do so, because another doctor's body was in contact with the patient's bed, and Sterk did not want to harm him. At another point in time, Albaghdadi called Sterk a "stupid son of a bitch." In the mid 1980s, Albaghdadi actually shocked a female respiratory technician, Linda Carter, with defibrillator paddles, because she did not move out of the way quickly enough. In 1987, Albaghdadi threw a patient chart in anger. The chart came within inches of ward clerk Evelyn Hubbart's face. In 1987, Albaghdadi yelled at Peggy Kapp, a respiratory therapist, shouting that she was too fat and slow to do her job. He ordered her to get her "tits" out of the way when she was attending to a patient. Kapp spoke to her supervisor, hospital employee Bill Vogel, and requested an apology. Vogel responded that she should not expect one. In 1987, Albaghdadi called Nursing Director Marilyn Rhodes a "fat bitch" or "fat lady."

On another occasion in 1987, Albaghdadi called nurse Jan Lauritzen a "dirty, lousy nurse," "a piece of shit," and said he wanted to "beat the shit out of [her]." In addition, he intentionally shoved her. Following Albaghdadi's encounter with Lauritzen, Mark Richardson, the hospital's former president, met with the doctor and told him that the hospital would not tolerate his abusive behavior. Albaghdadi initially denied any abuse of the staff. Richardson then questioned Pat Aldrich, a nurse manager who was present at the meeting, as to whether Albaghdadi had "intentionally intimidated, frightened or otherwise abused [the] staff." She said that the staff had felt "the effects of his personal attacks, all [were] frightened, and many would prefer not to see [his] patients." Albaghdadi then admitted that these feelings were his fault and stated that the outbursts were not beneficial to him or to Samaritan. As a result of this meeting, Richardson agreed that, even though Lauritzen had done nothing wrong, he would reorganize the schedule so that, when possible, she would not attend Albaghdadi's patients.

The record also contains evidence of the hospital's knowledge of Albaghdadi's abusive behavior in the form of statements and discussions about his cultural background.[1] Throughout the time that Albaghdadi has worked at the hospital, many members of the hospital staff, including management personnel, have discussed his behavior, speculating that perhaps it might be attributed to his culture's attitude toward women. Albaghdadi is a native of Iraq. Moreover, Albaghdadi's behavior was often a subject of discussion at hospital management meetings, and staff members suggested that nurses and technicians should not look Albaghdadi in the eye because he does not like women to do so.

The record also contains four alleged instances of Albaghdadi's abuse of male staff members. First, Vogel testified that Albaghdadi might have sworn at a male respiratory technician, Ron Drish, for being slow. Second, Hesselman said that Albaghdadi initially raised his voice in their meeting about the Kopp incident. Third, Albaghdadi raised his voice and swore at Dr. James Clark, a hospital pathologist, for cancelling a test Albaghdadi had ordered. And, fourth, Albaghdadi called Ron Reed a "goddamn bastard" during the same incident in which he assaulted Lee Kopp. However, Aldrich stated that based on her observations, Albaghdadi's treatment of female employees is worse than his treatment of male employees. She also said that Albaghdadi regularly worked with Evan Davis, a male nurse, and had not had any disputes with Davis similar to those he typically had with female nurses.

## II.

### A.

■ Summary judgment is appropriate only when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). On appeal, we apply the same

---

1. It is not proper to draw any inference about Albaghdadi's motivation from the fact that he is of Iraqi extraction. That would be an impermissible ethnic stereotype. We mention this fact only as evidence that the hospital may have recognized that Albaghdadi did not treat women and men evenhandedly.

standard the District Court did, *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir. 1982), considering only the record developed below. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving parties, here the defendants, bear the burden of showing that no genuine issue of material fact exists. *Id.* at 157, 90 S.Ct. at 1608; *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). At the summary-judgment stage, we resolve all disputed facts and draw all inferences in favor of the plaintiff. See *Hillebrand v. M–Tron Industries, Inc.,* 827 F.2d 363, 365 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989).

■ To defeat a motion for summary judgment, Kopp must show that a genuine dispute about a material fact exists on her Title VII, hostile-environment sexual-harassment claim. To establish the elements of a sexual-harassment claim based on a hostile environment, Kopp must show that:

> (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) [Samaritan] knew or should have known of the harassment and failed to take proper remedial action.

*Burns v. McGregor Electronic Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992) (citation omitted). The predicate acts which support a hostile-environment sexual-harassment claim need not be explicitly sexual in nature. *Hall v. Gus Construction Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir.1988). Rather, the key issue "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring). Hostile-environment sexual harassment is actionable under Title VII, when it is sufficiently patterned or pervasive. *Hall, supra,* 842 F.2d at 1014; *McKinney v. Dole,* 765 F.2d 1129, 1138 (D.C.Cir.1985). To determine whether a work environment is hostile or abusive, the

adjudicator must consider all of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, supra,* — U.S. at —, 114 S.Ct. at 371. Psychological harm to the plaintiff is relevant, as one factor among many, but Title VII does not require concrete psychological harm. *Id.* Once an employer becomes aware of sexual harassment, it must promptly take remedial action which is reasonably calculated to end the harassment. *Barrett v. Omaha National Bank,* 726 F.2d 424 (8th Cir.1984).

### B.

■ We conclude that Kopp has provided evidence sufficient to overcome a summary-judgment motion on her sexual-harassment claim. Albaghdadi was abusive to Samaritan employees. Over the course of more than a decade, Albaghdadi yelled at, swore at, threatened, and physically endangered Samaritan employees. The District Court stated in its order "that Albaghdadi was abusive to Samaritan employees when he perceived employee mistakes or mismanagement." D.Ct. Order, 6 (Jan. 26, 1993). The plaintiff disputes this assertion, arguing that several of the incidents in the record do not involve patient care or employee mistakes. Whether this conclusion is true or not, it does not, by itself, overcome the plaintiff's evidence.

More importantly for her Title VII claim, the incidents of abuse Kopp has cited in the record involve primarily women. Of the incidents cited in this opinion alone, approximately ten involved female employees; only four involved male employees. Further, the incidents involving female employees are of a more serious nature than those involving male employees. For example, several of Albaghdadi's alleged abuses of women involve actual physical contact and harm; all of the incidents involving male employees consist only of a raised voice or a verbal insult. On this record, a fact-finder could conclude that Albaghdadi's treatment of women is worse than his treatment of men. Thus, if proven at trial, Kopp has provided sufficient

evidence to succeed on her claim that Albaghdadi's conduct was gender-based.

The record also reveals that the hospital was well aware of Albaghdadi's behavior. Although not all of Kopp's co-workers brought Albaghdadi's actions to the attention of Samaritan's administration, some did. In 1987, Peggy Kapp spoke to her supervisor about Albaghdadi's treatment of her, and Bill Vogel responded that she should not expect an apology. Jan Lauritzen's co-workers filed a report after Albaghdadi yelled at and pushed her. In response, the hospital's former president met with Albaghdadi and told him that the hospital would not tolerate any more abusive behavior from him. Furthermore, Pat Aldrich, a member of the management team, stated that Albaghdadi's actions were common knowledge at the hospital and among management. She also indicated that his behavior was a frequent subject of discussion at management meetings, and that when she first started work at Samaritan, she was warned about him. For example, she was told not to look him in the eye. In addition, Aldrich testified that at a meeting with Albaghdadi and the hospital president, in response to the president's request, she told Albaghdadi that employees were afraid of him and would prefer not to work with him because of the nature of his actions. This evidence is admissible at trial either as proof of the hospital's knowledge about Albaghdadi's behavior or as admissions. When viewed in the light most favorable to the plaintiff, this evidence suggests that the hospital, which was responsible for Kopp's employment situation, was aware of Albaghdadi's behavior.

The hospital contends that it dealt with Albaghdadi's behavior effectively and emphasizes that Albaghdadi has had no further encounters with Kopp. Kopp disputes that the hospital has resolved the situation adequately. Because many possible explanations exist for Albaghdadi's having had no further confrontations with Kopp, we believe this dispute is also one appropriately resolved at trial. Perhaps Albaghdadi and Kopp have not had any further conflicts because Kopp no longer works on north campus. Or perhaps they have not had any further encounters because Kopp filed this suit. The hospital may assert the measures it took to address the Albaghdadi situation as a defense at trial, but whether those measures were sufficient is not an issue appropriately resolved at the summary-judgment stage on this record.

In sum, the evidence available to the District Court, viewed in the light most favorable to the plaintiff, is sufficient to withstand a motion for summary judgment. The evidence reveals that the instances of Albaghdadi's abusive treatment of women were greater in number and severity than those involving men. The evidence also suggests that the hospital was aware of Albaghdadi's treatment of Kopp and others.

The defendants assert other legal defenses—the hospital, for example, claims that Albaghdadi was not its employee, and that it therefore cannot be liable for his conduct. The District Court did not reach these defenses. We express no view on their merits.

The judgment is reversed, and the cause remanded for further proceedings consistent with this opinion.