Andrea R. **BROWN**, Plaintiff,

v.

**CITY OF LITTLE ROCK**,
et al., Defendants.

No. LR–C–96–524.

United States District Court,
E.D. Arkansas,
Western Division.

May 12, 1997.

*MEMORANDUM OPINION*
*AND ORDER*

SUSAN WEBBER WRIGHT, District Judge.

This is an employment discrimination case based upon allegations of sexual harassment and racial discrimination. Plaintiff Andrea R. Brown ("Brown") alleges that defendants the City of Little Rock ("City"), John Pryor ("Pryor"), Gary Davis ("Davis"), and Lynn Umholtz ("Umholtz") violated Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–5.[1] Before the Court is defendants' motion for summary judgment.[2] After carefully considering defendants' motion and plaintiffs response, this Court grants defendants' motion for summary judgment.

### I.

The following facts are undisputed. Plaintiff Brown was employed by the City from August 28, 1995 to February 28, 1996 as an Accounting Clerk II in the accounting and records division of the Finance Department. At all relevant times, defendant Pryor was the Director of the Finance Department and had ultimate authority over personnel decisions within the Department. Defendant Davis was the Accounting and Reporting Manager for the Finance Department and supervised defendant Umholtz. Defendant Umholtz was a Supervisor within the Finance Department and supervised plaintiff Brown.

At all relevant times, Brown's responsibilities as an Accounting Clerk II included data entry for accounts payable and filing and processing checks. Brown and Louise Drayton ("Drayton"), another African American female who was hired as an Accounting Clerk II months before Brown, were the only City employees supervised by defendant Umholtz, a Caucasian female.

When Brown was employed by the City, the City had a policy whereby non-uniformed employees were on probationary status for the first six (6) months of their employment. According to City policy, an extension of probationary status could be granted only for

---

1. Docket No. 1.

2. Docket No. 10.

illness, injury, or extenuating circumstances. The City also had a policy which did not permit employees on probation to be awarded vacation days.

Brown suffered some stress during the time she worked for the City. She was attempting to buy one home and later actually bought a different home. Her stress over purchasing a home, and the accompanying credit problems, caused Brown to be absent from work on some occasions.

On January 12, 1996, Brown and Umholtz had a meeting about Brown's work performance. Brown claims that she was reprimanded. Among the issues discussed at the meeting were Brown's eating meals at her desk; not answering other telephones; not informing her immediate supervisor that she, Brown, would be absent; visiting with City employees from other areas; spending time on personal correspondence; and spending time not working while at work. At the meeting, Umholtz referred to a list of these issues. The list was written on something similar to a notepad or phone message pad.

Brown alleges that Umholtz made two sexually harassing comments, one in November of 1995 and the other in the first part of January of 1996. Brown does not allege that she experienced any sexual harassment prior to the comment in November of 1995, after the comment in the first part of January of 1996, or in between these two dates. Brown claims that Drayton was present when the two allegedly sexually harassing comments were made by Umholtz and that Mary Ellen Ewing ("Ewing"), another employee who dealt with the computer system in the City Finance Department, also was present when one of the comments was made.[3]

Brown does not allege that defendants Pryor, who was Director of the Finance Department, or Davis, who was Umholtz's immediate supervisor, were involved in the sexual harassment or in creating the allegedly hostile work environment. Brown admits that the environment of the area where she worked at the City was not anti-female. She cannot say whether she was treated worse than the City's male employees.

Brown does allege that she was treated differently than Jim Chandler ("Chandler"), a Caucasian male who had recently been hired by the City as Controller and second in command of the Finance Department. Brown knows nothing of Chandler's work qualifications or actual job performance. Brown does not allege that Umholtz or Davis were involved in any of the alleged discrimination or unequal treatment based upon sex involving Chandler and Brown. Brown also alleges that she was treated differently than Drayton, an African American female who held the same position as Brown, who had a number of months more experience than Brown, and who was the only individual in the Finance Department doing the same work as Brown.

Brown admits that while employed by the City, she attended an orientation meeting with someone from the City Personnel Department and was made aware that the City had certain policies and procedures. During the time Brown worked for the City, she never informed Pryor, Davis, the City Personnel Department, or anyone else at the City that she believed Umholtz had sexually harassed her or that she was otherwise discriminated against.

When the end of Brown's probationary period was approaching, Davis considered extending Brown's probationary status and sent a memorandum to the City Personnel Director, Britt Rice ("Rice"), advising that such an extension might be beneficial. However, Davis stated that Brown needed to improve her work habits. In response to Davis's memorandum, Rice strongly advised against granting an extension of Brown's probationary status.

On February 16, 1996, Umholtz and Davis had a meeting in Davis's office with Ewing and Alan Bohannon ("Bohannon"), two non-supervisory employees of the Finance Department. Ewing dealt with the computer system in the Finance Department. Bohannon, although usually a non-supervisory em-

---

3. Drayton does not recall one of the comments and does not believe that the other comment was directed at anyone in particular. (Drayton Aff. at

1.) Ewing does not recall Umholtz making any sexually harassing comments. (Ewing Aff. at 2.)

ployee, assumed control of the accounting and records division of the Finance Department in Davis's absence. Umholtz, Davis, Ewing, and Bohannon are all Caucasian.

Neither Brown, Drayton, who was an African American female also employed as an Accounting Clerk II, nor Laverne Duvall ("Duvall"), who was an African American female employed as a Budget Compliance Analyst in the Finance Department, were asked to attend the meeting. The door was closed during the meeting, and the meeting lasted approximately 15–20 minutes. Brown did not know and no one told her what was discussed during the meeting. Brown was advised shortly after this meeting on February 16, 1996, that she would be terminated on February 28, 1996.

Brown was terminated from her position at the end of her probationary period on February 28, 1996. After being terminated, on April 1, 1996, Brown filed a charge of sex and race discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was terminated due to her race, African American, and her sex, female. The EEOC issued a Dismissal and Notice of Rights on April 10, 1996. Brown then filed the current lawsuit alleging that she was subjected to hostile environment sexual harassment while employed by the City and was terminated from her position as an Accounting Clerk II due to her race and sex.

## II.

In support of defendants' motion for summary judgment, defendants assert that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law pursuant to Fed.R.Civ.P. 56 on plaintiff's sexual harassment claim, discrimination claim, and disparate impact claim.

## A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judg-

ment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not rest on mere allegations or denials of her pleading but must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law. *Holloway v. Pigman,* 884 F.2d 365, 366 (8th Cir.1989).

## B.

Title VII prohibits "an employer" from discriminating:

> against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a)(1).

"It is well-settled that a Title VII plaintiff alleging discriminatory treatment must prove that the defendant intentionally discriminated." *Jiles v. Ingram,* 944 F.2d 409, 413 (8th Cir.1991). The plaintiff may prove intentional discrimination through direct evidence. However, the plaintiff may also prove intentional discrimination through cir-

cumstantial evidence by using an indirect method of proof, the burden-shifting analysis set forth by the Supreme Court in the *McDonnell Douglas* line of cases. *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir.1996). *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because plaintiff Brown's case relies solely upon circumstantial evidence to prove discriminatory intent, the Court will apply the *McDonnell Douglas* analysis to her claims.

Under the *McDonnell Douglas* analysis, at all times the plaintiff carries the burden of persuasion to show that the adverse employment action was motivated by intentional discrimination. *Hossaini v. Western Mo. Med. Ctr.*, 97 F.3d 1085, 1088 (8th Cir.1996). However, the burden of production shifts. First, the plaintiff must produce sufficient evidence to establish a *prima facie* case. Once the plaintiff has established a *prima facie* case by a preponderance of the evidence, the plaintiff has created a rebuttable presumption of discrimination. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The burden of production then shifts to the defendant employer to rebut the presumption of discrimination by offering a legitimate, nondiscriminatory reason for its conduct. *Stevens v. St. Louis Univ. Med. Ctr.*, 97 F.3d 268, 270–71 (8th Cir.1996).

If the employer advances a legitimate, nondiscriminatory reason for its conduct, the court will not second guess the employer's decision. The court's purpose is not to sit as a "super-personnel department," reexamining and assessing the correctness or wisdom of the employer's business decisions. *Krenik v. County of Le Sueur*, 47 F.3d 953, 960 (8th Cir.1995). Instead, the court's purpose is to ensure that the reason given by the employer is legitimate and nondiscriminatory, not a pretext for discrimination.

If the employer advances a legitimate, nondiscriminatory reason for its conduct, the plaintiff must then show sufficient admissible evidence from which a rational finder of fact could conclude that the employer's proffered nondiscriminatory reason was not the real reason for its conduct and that instead the employer's conduct was motivated by intentional discrimination. *See Hicks*, 509 U.S. at 515, 113 S.Ct. 2742; *Lang v. Star Herald*, 107 F.3d 1308, 1311 (8th Cir.1997). In other words, the plaintiff must *both* prove that the defendant's proffered reason was "false" and suggest that a "discriminatory animus lies behind the defendant's neutral explanations." *Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir.1996). *See also Hicks*, 509 U.S. at 515, 113 S.Ct. 2742.

1.

█ First, the Court will apply the *McDonnell Douglas* analysis to plaintiff Brown's sexual harassment claim. Generally, sexual harassment claims may be separated into two categories, *quid pro quo* claims and hostile environment claims. *Quid pro quo* claims arise when the plaintiff's receipt of benefits or maintaining the status quo in the plaintiff's work environment is conditioned upon acquiescence to sexual advances. *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir.1995). Hostile environment sexual harassment occurs when unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct have the purpose or effect of unreasonably interfering with the plaintiff's work performance or creating an intimidating, hostile, or offensive work environment. *Id.* at 474.

In the case at bar, Brown makes no allegations of *quid pro quo* sexual harassment. Instead, Brown alleges that she was subjected to comments of a sexually harassing nature by defendant Umholtz and that she was subjected to a hostile working environment after she informed Umholtz that she did not welcome such comments. (Pl.'s Am. Compl. at 2.) Brown does not allege that defendant Pryor, who was the Director of the Finance Department, or defendant Davis, who was Umholtz's immediate supervisor, were involved in the alleged sexual harassment or in

creating the allegedly hostile work environment.

The Eighth Circuit Court of Appeals has determined that to establish a *prima facie* case of hostile environment sexual harassment, a plaintiff must establish by a preponderance of the evidence that:

(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) [her employer] knew or should have known of the harassment and failed to take proper remedial action.

*Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996) (citing *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993)).

█ In the case at bar, plaintiff Brown satisfies the first element of the *prima facie* case by being female. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir.1996). To satisfy the second element of the *prima facie* case, Brown must establish that she was subject to "unwelcome sexual harassment." *Kopp,* 13 F.3d at 269. Harassing conduct is considered unwelcome if it was "uninvited and offensive." *Burns v. McGregor Electronic Indus., Inc.,* 989 F.2d 959, 962 (5th Cir.1993). Brown must establish that by her conduct, she indicated that the alleged harassment was unwelcome. *Quick,* 90 F.3d at 1378.

█ To establish that the harassment she complains of was "based on sex," the third element of the *prima facie* case, Brown may establish that sexual behavior was directed at her. Generally, sexual behavior directed at a woman raises the inference that the harassment was based on sex. *Burns v. McGregor Electronic Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992), *rev'd on other grounds,* 989 F.2d 959 (8th Cir.1993). However, the predicate acts which support a hostile environment sexual harassment claim need not be explicitly sexual in nature. *Kopp,* 13 F.3d at 269. To establish that the harassment was based on sex, Brown may also establish that "members of one sex [were] exposed to disadvantageous terms or conditions of employment to which members

of the other sex [were] not exposed." *Quick,* 90 F.3d at 1378 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)).

█ To satisfy the fourth element of the *prima facie* case, Brown must establish that the harassment affected a term, condition, or privilege of employment. This factor requires that Brown establish that her workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). *See also Harris,* 510 U.S. at 21, 114 S.Ct. 367. To determine whether Brown's work environment was hostile or abusive, this Court must consider all of the circumstances, including the frequency of the alleged discriminatory conduct; its severity; whether it was physically threatening or humiliating or merely an offensive utterance; and whether it unreasonably interfered with Brown's work performance. *Harris,* 510 U.S. at 22, 114 S.Ct. 367; *Kopp,* 13 F.3d at 269. If Brown is unable to demonstrate that Umholtz's behavior was so severe that or pervasive that it created an abusive working environment, Brown cannot withstand defendants' motion for summary judgment. *Callanan,* 75 F.3d at 1296.

The final element of the *prima facie* case requires that Brown establish that her employer knew or should have known of the alleged sexual harassment and failed to take immediate and appropriate action. *Id.*

█ In the case at bar, Brown claims that only her immediate supervisor was involved in the alleged hostile environment sexual harassment. Umholtz, Brown's immediate supervisor, is female. Sexual harassment by members of the same gender is actionable. *See, e.g., Quick,* 90 F.3d at 1372. However, based upon the record before the Court, Brown's allegations fall far short of proving the sort of sustained harassment the Eighth Circuit Court of Appeals has required to maintain a hostile environment sexual

harassment claim. *See, e.g., Callanan,* 75 F.3d at 1296.

In support of her hostile environment sexual harassment claim, Brown alleges that Umholtz, her immediate supervisor, referred to Brown and a coworker as her "employees." (Brown Dep. at 34.) Brown claims that this comment was verbally abusive. Brown also claims that Umholtz asked her questions about her personal business, such as her home and car, which Brown did not want to answer. Brown maintains that she told Umholtz these questions were offensive. (Brown Dep. at 55–57.)

Brown further alleges that Umholtz made two comments of a sexually harassing nature, one in November of 1995 and one in January of 1996. In her deposition, Brown described Umholtz's first comment as follows:

Q: If you could please tell me about that first comment that you mentioned which you believe to be in November of '95.

A: Ms. Umholtz was telling this joke about some lady who took some man out in the woods and she gave him some and told him that no one had ever had one of those before, and she told me, "Well, Andrea, what you ought to do is to take that young man out that you're having problems with and give him some and tell him that no one had ever had one of those before."

(Brown Dep. at 28.)

Brown described Umholtz's second comment as follows:

Q: And then if you could, tell me about the second comment that was in the first part of January you said.

A: As Ms. Drayton and I were leaving for the day—as I said, Ms. Umholtz constantly tried to manipulate me trying to get personal information out of me. Just anything about me. She made the comment she needed a sugar daddy.

Q: And she said about you that you need a sugar daddy?

A: Well, she was saying that—she said she needed a sugar daddy—

Q: Oh, she needed—

A:—but she was saying that to me.

Q: She was telling you that she needed a sugar daddy.

A: Yes.

(Brown Dep. at 30.)

Aside from these two comments on these two dates, Brown admits that Umholtz did not make any other comments of a sexual nature. (Brown Dep. at 26–27.) However, later Brown contradicts her previous statement and claims that Umholtz constantly made jokes about sex. (Brown Dep. at 32.) Unlike her description of the two comments which Umholtz allegedly made, Brown does not describe any of these jokes in detail in either her deposition or her response to defendants' motion for summary judgment.

Brown also asserts that Umholtz redrafted and retyped a letter that Brown had already drafted and typed; placed Brown's name on the letter; submitted it to the supervisor for approval; and mailed out the letter. (Brown Dep. at 41–44.) Brown claims that Umholtz followed her around the office to ensure that she was not conducting personal business at work. (Brown Dep. at 36–38.) Brown also claims that Umholtz followed her into the lounge area. (Brown Dep. at 38.) Brown alleges that on one occasion when Umholtz was not at work, someone reported to one of Umholtz's supervisors that Umholtz had not informed anyone that she would not be at work. After that occasion, Brown states that Umholtz made it a point to stress to Brown where Umholtz would be. (Brown Dep. at 57–58.)

Brown claims that Umholtz gave her assignments for which she was not properly trained and that Umholtz once threatened Brown's job while reprimanding her. (Brown Dep. at 34–35.) Brown claims that in another incident, Brown was on her way to count checks and mail them when Umholtz stopped her and assigned the duty to someone else, informing Brown that company policy required someone else complete the task. However, Brown states that previously, she had counted checks and mailed them without Umholtz objecting. (Brown Dep. at 40–41.)

Even when this Court views all of the inferences to be drawn from these allegations in favor of Brown, this Court concludes that

Brown's allegations do not indicate that the harassment was "based on sex." Brown's allegations do not suggest that Umholtz directed sexual behavior at Brown. Instead, Brown states in her deposition that Umholtz never sexually propositioned her; never made sexual advances toward her; never asked or demanded to be involved in any intimate relations with her; never attempted to touch her in any sexually suggestive way; never put any sexual pressure on her; and never showed any sexual attraction to her. (Brown Dep. at 33.) Similarly, Brown's factual allegations do not indicate that members of one sex were exposed to disadvantageous terms or conditions of employment at the City to which members of the other sex were not exposed. Brown admits that the environment of the area where she worked at the City was not anti-female, and she admits that she cannot say whether she was treated worse than male employees at the City.

Furthermore, this Court concludes that such allegations do not demonstrate that Brown's work environment was filled with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive so as to alter the conditions of Brown's employment or to create an abusive work environment. The incidents Brown describes were not frequent, severe, physically threatening, or humiliating enough to be actionable under Title VII.

Even if this Court were to assume that Brown had established by a preponderance of the evidence the first four elements of a *prima facie* case for hostile environment sexual harassment, Brown makes no factual allegations to support her claim that her employer knew or should have known of the alleged harassment and failed to take remedial action. Instead, Brown admits that while employed by the City, she attended an orientation meeting with someone from the City Personnel Department and was made aware that the City had certain policies and procedures. However, Brown admits that she never informed Davis, Pryor, the City Personnel Department, or anyone else at the City that she believed that Umholtz had sexually harassed her or that she was otherwise

discriminated against. (Brown Dep. at 60–61.)

Based upon the foregoing analysis, this Court concludes that plaintiff Brown has failed to establish a *prima facie* case of hostile environment sexual harassment by a preponderance of the evidence. Therefore, this Court grants defendants' motion for summary judgment on plaintiff's hostile environment sexual harassment claim.

### 2.

 Now, the Court will apply the *McDonnell Douglas* analysis to plaintiff Brown's discrimination claim. Brown claims that she was discharged based upon her race and sex. Brown asserts that she was treated differently than Chandler, a Caucasian male, in that although both Brown and Chandler missed time from work due to extenuating circumstances during their respective probationary periods, Brown was terminated while Chandler was retained after their respective probationary periods ended.

The Eighth Circuit Court of Appeals has determined that to establish a *prima facie* case of employment discrimination, a plaintiff must establish by a preponderance of the evidence that:

(1) she is a member of a protected class; (2) she is qualified for the position; (3) adverse action was taken against her; and (4) the action occurred in circumstances giving rise to an inference of discriminatory motivation.

*Thomas v. Runyon*, 108 F.3d 957, 959 (8th Cir.1997). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

This Court will assume for the sake of analysis that Brown has established a *prima facie* case that defendants had a discriminatory motive when terminating her. The burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for Brown's termination. *Thomas*, 108 F.3d at 959.

In the case at bar, this Court concludes that defendants have advanced a legitimate, nondiscriminatory reason for Brown's termination. Brown admits that on January 12,

1996, Umholtz met with her and discussed a number of alleged deficiencies in her work performance. (Brown Dep. at 44–50; Umholtz Aff. at 2.) Among the issues discussed at the meeting were Brown's eating meals at her desk; not answering other telephones; not informing her immediate supervisor that she, Brown, would be absent; visiting with City employees from other areas; spending time on personal correspondence; and spending time not working while at work. (*See* Umholtz Aff. at Ex. 1.)

Despite these deficiencies in her work performance, Brown's supervisors explored the possibility of extending Brown's probationary status beyond the typical six (6) month period. (Davis Aff. at 2, Ex. 1; Umholtz Aff. at 2.) However, Rice, the Director of Human Resources for the City, had to approve an extension of probationary status. In Brown's case, Rice strongly advised against extending probationary status. The City's Administrative Personnel Policy and Procedure Manual permitted extending probationary status for reasons of illness, injury, or extraordinary circumstances. (Rice Aff. at Ex. 3.) Rice maintains that the City did not historically grant extensions in cases involving unsatisfactory work performance. In Brown's case, when requesting the extension, Davis stated that Brown needed to improve her work habits. Based upon this statement from Davis, Rice determined that Brown's situation did not qualify as an extenuating circumstance and therefore strongly advised against granting Brown an extension. (Rice Aff. at 2, Ex. 2.)

Brown's supervisors followed Rice's advice, did not extend Brown's probationary status, and terminated Brown. Brown's supervisors maintain that their decision to terminate Brown was based upon Brown's work habits and job performance. Because defendants have advanced a legitimate, nondiscriminatory reason for Brown's termination, the burden of production shifts back to Brown to prove that defendants' proffered reasons for terminating her are false and that defendants had a discriminatory motive when terminating her.

Brown relies upon a comparison of her situation and Chandler's situation to suggest that defendants had a discriminatory motive in terminating her. Brown claims that both she and Chandler suffered extenuating circumstances and missed time from work during their respective probationary periods, yet she was terminated while Chandler was retained. Brown states that she suffered stress when purchasing her home and claims that this stress created her extenuating circumstance. She states that Chandler's wife's pregnancy created his extenuating circumstance. During Chandler's probationary period, his wife was put on bed rest while pregnant with the family's second child. The seriousness of his wife's condition necessitated that Chandler take her to doctor appointments and otherwise care for her on occasion. (Chandler Aff. at 1.)

However, because Chandler was not an employee similarly situated to Brown, Brown's comparison fails to rebut defendants' legitimate, nondiscriminatory reason for terminating her. *Lidge–Myrtil v. Deere & Co.*, 49 F.3d 1308, 1311 (8th Cir.1995) (disparate treatment of dissimilarly situated employees does not show that employer's explanation for termination is pretextual); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 777 (8th Cir.1995) (same). Chandler was hired by the City for a management position, Controller and second in command of the Finance Department. Chandler's work responsibilities included auditing the Finance Department records and supervising the daily working of the Finance Department. Because of the nature of his work, Chandler was able to use a home computer and cellular telephone to accomplish his job responsibilities while working at home. (Chandler Aff. at 2.)

Brown was hired as an Accounting Clerk II. Brown's work responsibilities included entering data for accounts payable and filing and processing checks. (Brown Dep. at 7.) Much of the paperwork required for Brown's work was sensitive and could not be taken elsewhere to be processed. (Chandler Aff. at 2.) Therefore, Brown's duties had to be performed at the office, and unlike Chandler, Brown could not work from home. These differences in their employment situations

demonstrate that Chandler was not an employee similarly situated to Brown.

Furthermore, defendants did not terminate Brown based solely upon the days she missed from work during her probationary period. Defendants maintain that they terminated Brown based upon her work habits and job performance. Prior to her termination, Brown met with Umholtz and discussed several alleged deficiencies in Brown's work performance. Only one of the six alleged deficiencies related to Brown's missing work. Brown has presented no evidence to compare her work performance to Chandler's work performance. For these reasons, Brown's comparison between her situation and Chandler's situation fails to rebut defendants' legitimate, nondiscriminatory reason for terminating Brown.

Brown also alleges that she was treated differently than Drayton, an African American female who held the same position as Brown and who was the only individual in the Finance Department doing the same work as Brown. (Brown Dep. at 19–20.) These allegations do little to advance Brown's claims that she was discriminated against on the basis of race or sex because Drayton, like Brown, is an African American female.

Brown also alleges that four Caucasian employees of the Finance Department held a closed door meeting, excluding her and two other African American employees. Brown claims that shortly after this meeting, she was terminated. (Brown Dep. at 62–66.) Presumably, Brown also relies upon this incident to suggest that defendants had a discriminatory motive in terminating her. However, defendants have offered a legitimate, nondiscriminatory explanation for this meeting.

Umholtz, who was Brown's supervisor, and Davis, who was Umholtz's supervisor, met in Davis's office with two non-supervisory employees of the Finance Department, Ewing and Bohannon. Defendants maintain that Ewing was present at the meeting because she was responsible for the security of the computerized records in the Finance Department. Bohannon, although usually a non-supervisory employee, assumed control of the accounting and records division of the Finance Department in Davis's absence and therefore was also present at the meeting. The door was closed during the meeting, and the meeting lasted approximately 15–20 minutes.

Defendants state that Umholtz, Davis, Ewing, and Bohannon met to discuss whether, in light of the decision already made by Davis to terminate Brown, Brown should be allowed continued access to the Finance Department's sensitive computer system and records or whether Brown should be asked to leave immediately. (Umholtz Aff. at 2–3; Davis Aff. at 2–3; Ewing Aff. at 1–2.) These four individuals determined that Brown could be trusted not to disrupt the computer system or records. Therefore, although Brown was informed shortly after this meeting of her termination, she was allowed to remain on the job approximately two more weeks, until the final day of her probationary period.

Brown states that neither she, Drayton, nor Duvall were invited to attend the meeting. Brown, Drayton, and Duvall are all African American employees within the Finance Department. However, defendants maintain that these three individuals were not invited to attend the meeting because they were not supervisors within the Finance Department or in any way responsible for the computer system. Brown has offered no evidence and made no argument to rebut defendants' legitimate, nondiscriminatory reason for conducting this meeting and for including only Umholtz, Davis, Ewing, and Bohannon.[4]

---

4. In her deposition and again in her response to defendants' motion for summary judgment, Brown states that she felt that defendants abused their discretion by failing to allow her to have legal representation from the union at this meeting. (Brown Dep. at 62–65.) In her complaint, Brown does not allege that defendants violated any union agreement or employment contract. Instead, Brown only alleges that defendants violated Title VII. Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Title VII does not prohibit discrimination on the basis of union membership. Therefore, this Court will not address Brown's allegations regarding the union.

In regard to her discrimination claim, Brown has failed to meet her burden of proof. Even if this Court were to assume that Brown established a *prima facie* case of discrimination, Brown has failed to present sufficient admissible evidence from which a rational finder of fact could conclude that defendants' proffered legitimate, nondiscriminatory reason for terminating her was not the real reason for defendants' conduct and that instead defendants' conduct was motivated by intentional discrimination. Therefore, this Court grants defendants' motion for summary judgment on Brown's discrimination claim.

### 3.

■■■ Brown also stated in her deposition that she believed the City's policy regarding vacation pay was racially discriminatory. (Brown Dep. at 68, 91.) To establish a claim of racial discrimination on the basis of disparate impact, a plaintiff must show:

(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two.

*Pierce v. Marsh,* 859 F.2d 601, 604 (8th Cir.1988) (citing *McIntosh v. Weinberger,* 810 F.2d 1411, 1427 (8th Cir.1987)).

Although Brown alleges that the City's policy under which she did not receive vacation pay was racially discriminatory, Brown has come forth with no factual evidence to suggest that the policy as applied had a disparate effect on members of a protected class or that there was a causal connection between the application of the policy and such an effect. Furthermore, defendants maintain that the City's policy on vacation and vacation pay is that no vacation days are awarded during the first six (6) months while an employee is on probationary status. (Rice Aff. at 2.) Therefore, an employee leaving without successfully completing the probationary period is not allowed to be paid for vacation time since vacation time was never awarded. Defendants claim that this policy is applied to all employees regardless of race or sex. (Rice Aff. at 2.)

Brown has come forth with no evidence to refute defendants' legitimate, nondiscrimina-

tory explanation of the City's policy on vacation and vacation pay. Therefore, this Court concludes that Brown has failed to meet her burden of proof in regard to her disparate impact claim. The Court grants defendants' motion for summary judgment on Brown's disparate impact claim.

### III.

In conclusion, the Court finds that there are no genuine issues of material fact remaining for trial and that defendants are entitled to judgment as a matter of law on plaintiff Brown's hostile environment sexual harassment claim, discrimination claim, and disparate impact claim. The defendants' motion for summary judgment is granted. There being no remaining issues for trial, this case is hereby dismissed.