# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 98-2110

_____

Enoch Griffin,     *

       *

       Plaintiff-Appellant,     *

       *

v.     *    Appeal from the United States

       *    District Court for the

Pinkerton's, Inc., a foreign corporation;   *    District of Minnesota.

Edward Rudenick, individually and     *

as an employee of Pinkerton's, Inc.;     *

John Horan, individually and     *

as an employee of Pinkerton's, Inc.,     *

       *

       Defendants-Appellees.     *

_____

Submitted: February 10, 1999
Filed: April 8, 1999

_____

Before MCMILLIAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Enoch Griffin filed suit against Pinkerton's, Inc. (Pinkerton) and two of its employees, Edward Rudenick and John Horan.[1] He claimed that racial harassment by Pinkerton employees violated his rights under 42 U.S.C. § 1981 and the Minnesota

_____

[1]Horan was never properly served and the district court dismissed the claims against him. That dismissal is not at issue on appeal.

Human Rights Act (MHRA), Minn. Stat. § 363.03, and he also brought common law claims based on defamation, false imprisonment, negligent supervision and retention, and negligent infliction of emotional distress. The district court[2] granted summary judgment in favor of Pinkerton and Rudenick on all claims. We affirm.

Griffin worked in the housekeeping department of St. Paul Ramsey Medical Center (the hospital) and Pinkerton provided security services for the hospital under contract. This action grew out of five particular encounters Griffin had with Pinkerton guards. The first occurred early on the morning of June 6, 1994 after Griffin left work. He noticed that guard Edward Rudenick had followed him into the parking ramp and asked why. Rudenick responded that there had been a lot of cars reported stolen recently. Griffin stated that he was not a thief, that he worked at the hospital, and that he was going to get his car. Two weeks later Griffin again saw Rudenick in the ramp; this time he was crouching between cars. Griffin asked Rudenick what he was doing and again said he was not a car thief. Rudenick left after answering, "I didn't know it was you."[3]

At the end of June, Griffin was in the hospital lobby waiting for his wife to pick him up. He had been there about 15 to 20 minutes when a Pinkerton guard arrived and asked what he was doing. The guard said there had been a report of "a suspicious black male" in the lobby. Griffin learned that Rudenick was the dispatcher and went to speak with him, but he was later unable to recall the substance of their conversation. He has not produced evidence of any other incidents involving Rudenick.

---

[2] The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

[3] In his deposition Griffin testified inconsistently about whether Rudenick made this statement during their first or second encounter in the ramp.

Griffin experienced what he felt was discriminatory treatment when he arrived at work in the evening in February 1995. He followed two white employees into the building. John Horan, the Pinkerton guard on duty, waved at them, greeted them, and let them proceed to the elevator, but he stopped Griffin and asked for his identification. It is not disputed that all hospital employees were required to carry photo identification and to present their identification to the security guard on duty if they entered the hospital after nine in the evening. Griffin was told about this rule when he was first hired, and a large sign by the door indicated that identification was required for entrance. When Griffin refused to produce his identification but proceeded on into the hospital, Horan followed him into an elevator where he physically restrained him. Griffin complained to Horan that he had not asked the two white employees for identification. Horan said he knew them and called Griffin a "smart ass." Horan requested assistance and four or five other guards responded. One of them was Horan's supervisor who said he knew Griffin and let Griffin leave. Griffin complained to his supervisor, Laurel Mattson, who circulated a memo regarding the incident to her supervisor, Frank Sabo, and the head of security for the hospital, Keith Davidson.

The final incident occurred after Griffin arrived for work on the evening of May 2, 1995. He noticed that there was a crowd at the door and that the guard was on the phone so he walked past the guard station. It is unclear whether Griffin's employee badge was visible at the time, but guard Dana Johnson pursued him down the hallway and into the housekeeping department, demanding identification. Griffin did not stop or produce identification. Johnson requested assistance, and Horan and other guards reported to housekeeping. Griffin accused Johnson of harassing him by requesting identification once he had already passed the security desk. Johnson said Griffin thought he was better than anyone else. Griffin's supervisor, Laurel Mattson, commented that three security guards were more than needed to deal with an employee who had not shown his identification. Horan said Griffin would lose his

3

job over the incident, and Mattson testified in her deposition that Griffin had made threatening remarks to the guards. Griffin denies this.

After this incident the hospital began an investigation and suspended Griffin with pay. Griffin complained to his union representative about what had happened and that individual wrote the head of security about Griffin's encounters. Griffin read this memo aloud during a meeting with representatives from the hospital and the union. The hospital eventually reinstated Griffin but gave him a written warning. The warning stated that Griffin had been accused of using abusive language to a security officer and that the investigation had shown the accusation to be true. He was admonished that such behavior could not be tolerated and that further occurrences would result in more stringent disciplinary action.

Griffin pursued administrative relief against the hospital and filed this action in state court. His claim against the hospital has been settled, and he remains employed there. Appellees removed the case to federal district court on the basis of federal question jurisdiction. At the conclusion of discovery, Pinkerton and Rudenick filed their motion for summary judgment on all claims. The district court granted it, and Griffin appeals.[4]

We review a grant of summary judgment de novo. See Smith v. St. Louis Univ., 109 F.3d 1261, 1264 (8th Cir. 1997). Summary judgment is appropriate if the movants have shown that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law; in assessing the evidence we take the nonmovant's evidence as true, drawing all reasonable inferences in his favor. See

---

[4]In its written memorandum the district court commented that, "Ordinarily, the court does not weigh facts or evaluate . . . credibility"on a motion for summary judgment. It has been suggested that this statement shows the district court did not use the proper standard in making its decision, but our review of the record does not indicate that it failed to apply the correct standard despite this passing remark.

4

Fed. R. Civ. P. 56(c); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 268-69 (8th Cir. 1993).

Griffin claims that appellees violated his rights under 42 U.S.C. § 1981. This statute provides that:

> (a) All persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. 1981(a).

Section 1981(a) covers purely private acts of discrimination in the making and enforcement of contracts. See Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996); Mahone v. Waddle, 564 F.2d 1018, 1029 (3d Cir. 1977). Since the enactment of the 1991 Civil Rights Act, this provision has provided a basis for suits against employers for racial harassment on the job. See 42 U.S.C. § 1981(b); see also Winbush v. Iowa, 66 F.3d 1471,1476 n.7 (8th Cir. 1995) (noting that 1991 amendments overruled Patterson v. McLean Credit Union, 491 U.S. 164 (1989) which had held that the right to make and enforce contracts did not include right to be free of racial harassment). There are also several reported cases where § 1981 has been applied to discriminatory actions intended to interfere with the plaintiffs' contractual relations with third parties. See, e.g., Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1313 (9th Cir. 1992) (intentional deprivation of opportunity to enter contracts with others because of race may state claim under § 1981); London v. Coopers & Lybrand, 644 F.2d 811, 818 (9th Cir. 1981) (provision of adverse employment references with intent to discriminate on racial grounds establishes valid § 1981 claim).

In this case Griffin has not sued his employer or made claims that appellees were the employer's agents, and neither of them can be held liable under § 1981 for

5

the existence of a hostile work environment. Griffin claims that the appellees interfered with his employment contract with the hospital in that he was suspended with pay after his interactions with the Pinkerton guards. He has not shown that Pinkerton itself was ever notified about the conduct of any of the guards or that any statements or actions of Rudenick were motivated by discriminatory animus and the desire to affect his employment. Horan's statement that Griffin would lose his job cannot be imputed to either Pinkerton or Rudenick. As a matter of law he has not made out a claim against appellees under § 1981.

Griffin also has not shown that he was discriminated against because of his race. There is no dispute that there were real security concerns at the hospital and its parking area and that employees were required to show identification when entering the hospital after nine in the evening. No racially hostile comments were made to Griffin, and he has not shown that he suffered offensive conduct that similarly situated white counterparts did not. See Kopp, 13 F.3d at 269. The five incidents were also neither severe nor pervasive enough to have established a racially hostile work environment. See Cram v. Lamson & Sessions Co., 49 F.3d 466, 474-75 (8th Cir. 1995), Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981). Finally, Griffin failed to show that Pinkerton had actual or constructive knowledge of a racially hostile environment. See Whitmore v. O'Connor Management, Inc., 156 F.3d 796, 800 (8th Cir. 1998); Hall v. Gus Constr. Co., Inc., 842 F.2d 1010, 1015 (8th Cir. 1998).

Griffin claims that Pinkerton violated the MHRA because it had notice of racial harassment by its employees and failed to take corrective action. The MHRA protects against unfair employment practices by employers, labor organizations and employment agencies. See Minn. Stat. § 363.03(1). Griffin had none of these relationships with Pinkerton. The MHRA also prohibits others from aiding or abetting forbidden employment practices. See Minn. Stat. § 363.03(6). Griffin has not produced evidence showing that the hospital violated state law so his claims based on accessory liability for Pinkerton or Rudenick necessarily fail.

6

Griffin's other state law claims are also without merit. He argues that Pinkerton defamed him because Rudenick's statement to him in the parking ramp implied that he was a car thief and that Horan's report included statements that Griffin had made threats. He has, however, failed to show publication of a false statement tending to harm his reputation. See Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 886 (Minn. 1986); Stuempges v. Parke-Davis, 297 N.W.2d 252, 255 (Minn. 1980). He has not shown that any third party read Horan's report, and he himself was responsible for voluntarily repeating Rudenick's statements. See Lewis, 389 N.W.2d at 888. His claim that he was falsely imprisoned during the elevator incident fails because he knew what the guards were seeking and he could have produced his identification. See Peterson v. Sorlien, 299 N.W.2d 123, 128 (Minn. 1980) (awareness of reasonable non-dangerous means of escape renders restriction incomplete); Restatement (Second) of Torts § 36 (1965). Griffin's failure to show Pinkerton had actual or constructive notice of inappropriate conduct by its employees is fatal to both the negligent supervision and negligent retention claims. See Bruchas v. Preventive Care, Inc., 553 N.W.2d 440, 442-43 (Minn. Ct. App. 1996); Kresko v. Rulli, 432 N.W.2d 764, 769 (Minn. Ct. App. 1988).[5] Finally, Griffin's negligent infliction of emotional distress claim fails because he has neither satisfied the zone of danger test, see Stadler v. Cross, 295 N.W.2d 552 (Minn. 1980), nor shown that defamation or other willful, wanton, or malicious conduct exempts him from proving the threat of physical harm, see Bohdan v. All Tool Mfg. Co., 411 N.W.2d 902, 907 (Minn. Ct. App. 1987).

Accordingly, we affirm the judgment of the district court.

---

[5]Griffin has presented evidence purporting to show that Pinkerton knew guard Dana Johnson had psychological problems and that it failed to take certain steps in screening its employees. He has not shown, any connection between these facts and the racial harassment he alleges, however.

7

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.