**Michael NOBLE and Kelly Noble, Plaintiff,**

v.

**MONSANTO COMPANY, Defendant.**

No. 4–96–CV–20046.

United States District Court, S.D. Iowa, Central Division.

June 11, 1997.

Roger A. Huddle, Wapello, IA, for Plaintiffs Michael and Kelly Noble.

Gregory M. Garger, John M. Dickman, Winston & Strawn, Chicago, IL and Patrick W. Driscoll, Davenport, IA, for Defendant Monsanto Co.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BREMER, Chief United States Magistrate Judge.

This matter comes before the Court on Defendant's resisted Motion for Summary Judgment. (Clerk's No. 20).

Plaintiffs Michael and Kelly Noble filed this complaint on March 29, 1996, following Michael Noble's discharge from employment with Defendant, Monsanto Company (Monsanto). Counts I, II, and III of the complaint pertain to Plaintiff Michael Noble. Count I alleges hostile-work-environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C, § 2000e *et seq.;* Count II alleges sexual discrimination in violation of the Iowa Civil Rights Act (ICRA), Iowa Code § 216.6; Count III alleges intentional infliction of emotional distress in violation of Iowa common law. Count IV pertains to Plaintiff Kelly Noble, and alleges loss of consortium under Iowa common law.

In its Motion for Summary Judgment, Monsanto argues that Michael Noble (Noble) cannot prove sexual harassment under either Title VII or the ICRA because: 1) the claims are time-barred; 2) the alleged harassment was not based on sex; 3) the alleged harassment did not affect a term, condition, or privilege of Noble's employment; and 4) Monsanto took reasonable steps to stop the alleged harassment. Monsanto also asserts that Noble cannot prove his claim for intentional infliction of emotional distress, because: 1) the alleged conduct was not outrageous, 2) Noble's distress was not severe, 3)

Monsanto is not liable for actions of its non-supervisory employees, and 4) the tort claim is preempted by the Iowa Workers' Compensation Act. Finally, Monsanto asserts that Kelly Noble's loss of consortium claim necessarily falls if Noble's intentional infliction of emotional distress claim fails.

The Court heard argument on the Motion for Summary Judgment on March 29, 1997. This matter is fully submitted.

## I. Material Facts Not in Dispute

The following facts are either not in dispute, or are those viewed in the light most favorable to the Nobles. Fed.R.Civ.P. 56(c); *Chester v. Northwest Iowa Youth Emergency Serv. Ctr.*, 869 F.Supp. 700, 705 (N.D.Iowa 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).

In 1989, Monsanto hired Noble to work full-time at its Muscatine, Iowa, plant. Noble worked as a qualified technician in the compounding area, where plastic products are manufactured. Noble was a competent worker. William Lemkau, a foreman, and Harley Reynolds, a lead technician, reported that, because they found him to be irritating, co-workers did not like or want to work with Noble.

In December 1991, co-workers began ridiculing Noble. For example, co-workers nick-named Noble "Thumbske" after he injured his thumb at work. His injury, which was reported to management, caused employees in the department to lose certain safety incentive bonuses. Noble did not complain to Monsanto about the nickname "Thumbske." Noble's co-workers also wrote "K.I.A." (acronym for "know-it-all") and other derogatory comments on employees' work schedules and calendars, Noble's locker, and the men's restroom walls. Similar comments about other employees appeared on the calendars, work schedules, and the men's restroom walls. The parties agree there was no double entendre or sexual connotation to "Thumbske" or "K.I.A."

In early 1992, co-workers enlarged a copy of a dictionary definition of "gadfly,"[1] wrote Noble's name on it, and posted it in the compounding area. Co-workers used the nickname "gadfly" for Noble in various forms throughout the compounding area. Examples included a fly drawn in wet concrete leaving it permanently etched; the phrase "Home of the Noble Gadfly" temporarily appended to the department's e-mail signature; and drawings of the "gadfly" in various poses (i.e., playing a guitar, dressed in a superman costume, and as a bedbug) displayed in the work area and men's restroom. When Noble requested that "Home of the Noble Gadfly" be removed from the e-mail signature, it was removed the same day. None of these activities contained sexually explicit subject matter. When pictures of the "gadfly" were drawn on the men's restroom walls, Monsanto had the walls painted or washed to remove the graffiti.

Many employees in the compounding area had nicknames and participated in name-calling. Noble admits that he called or referred to others by their nicknames, including referring to a female co-worker as "bulldog," and writing non-work related comments on a co-worker's mail. Noble admits to calling other workers names, such as "brown-noser" and "kiss ass." Noble also admits that while at work he told sexist jokes, made gestures imitating oral sex on approximately 10 different occasions while co-workers spoke with supervisors, viewed pornography on the Internet and showed it to other employees, and watched a pornographic video.

Three drawings displayed in the work area in 1992 featured sexually explicit content. First, a drawing of a man sodomizing a woman was hung on the men's restroom wall. Noble's name was written on the paper above the drawing. Second, a posted drawing showed a deer sodomizing a hunter, with Noble's name written on the hunter. Third, a drawing titled "Gadfly's Prey" depicted a fly between the spread legs of a nude woman, with a graphic depiction of her genitalia. (Def.'s Ex. C., Pl.'s Ex. 1.) Noble alleges he saw approximately 30 to 40 photocopies of "gadfly's Prey" posted throughout the compounding area prior to the start of Noble's shift. Co-worker Ed Harris stated there may have been as many as 100 of these posters throughout the plant.

Foreman Larry Green learned about this drawing at the beginning of his shift, and he instructed Noble's co-workers to remove and dispose of the drawings. Harris and Reynolds stated that the drawings were removed from the walls immediately, within about an hour. Noble does not contest the fact that the posters were promptly removed, but he states he found approximately one additional copy of the drawing per day at work for the next two weeks. During the two days following this incident, Green met with compounding area employees, reminded them of Monsanto's anti-harassment policy,[2] and told them that the display of the "Gadfly's Prey" poster was unacceptable, and such conduct must stop.

The record shows that around the same time in 1992, another depiction of "Gadfly's Prey" was drawn directly on the men's restroom wall, using indelible ink. When the evidence is viewed in the light most favorable to Noble, it appears that throughout 1992, the drawing would be washed or painted over by Monsanto, but then would be retraced. Neither party indicates how often the drawing appeared, or the amount of time that elapsed before Monsanto would wash off or paint over the drawing.

1. The parties agree that the definition of gadfly was copied from a standard dictionary and meant "1: any of various flies that bite or annoy livestock; 2: an intentionally annoying person who stimulates or provokes others especially by persistent irritating criticism." *See Webster's Ninth New Collegiate Dictionary* 501 (1991).

2. Monsanto's anti-harassment policy included in part: "The Agricultural Group of Monsanto Company (AG) is committed to maintaining a work environment that is safe, productive and fair to every employee. To this end, the purposes of this policy are to make clear that harassment of employees will not be tolerated in the AG work environment, and set forth the procedure for filing and resolving harassment complaints." (Def.'s Ex. D.) The policy defines illegal harassment (including sexual harassment) and the complaint procedure. *Id.*

Noble met with Sue Bevington, Monsanto's human resources representative, in May or June of 1992 to complain about the "Gadfly's Prey" drawing. Noble was unable to suggest specific names of persons who might have been responsible for the drawing. In 1993, Noble learned that Harris had drawn the "Gadfly's Prey" poster, but he did not inform Monsanto at that time. Following the "Gadfly's Prey" drawing in 1992, no incidents featured sexually explicit content before Noble's departure from the work place in September 1995.

In addition to his complaint to Bevington regarding "Gadfly's Prey" made in May or June of 1992, Noble complained about general harassment on three occasions. On the first occasion, in May 1993, Noble met with Bevington when he was being reassigned to a different shift. Noble resisted the shift change because he thought the workers on the newly assigned shift were the harassers. When asked who he suspected, Noble did not offer any names, or state that he perceived the harassment to be because of his sex. The second occasion was in November 1994, when Janice Hotz, the compounding area's new supervisor, met with Noble regarding his absenteeism, and Noble complained about harassment in general. Again, Noble offered no names and did not describe the harassment as gender-based. The third occasion occurred on September 15, 1995, when Hotz gave Noble a disciplinary letter regarding excessive absences. Noble again complained about harassment, but when Hotz asked for details about the harassment, Noble told her he would provide details the following week. Noble never returned to work after September 15, 1995. During September 1995, Noble underwent psychiatric treatment for symptoms of anxiety and depression.

On October 9, 1995, Noble told Joe Devine, Monsanto's Human Resources Leader, that Harris had drawn "Gadfly's Prey." Monsanto responded by hiring a handwriting expert, who confirmed that Harris had drawn the picture. Monsanto discharged Harris on November 29, 1995.

On November 13, 1995, Noble filed a sex discrimination complaint with the Iowa Civil Rights Commission. On January 4, 1996, Noble's psychiatrist, James Beeghly, M.D., stated that Noble could return to work and that in his view, Noble's psychiatric condition was resolved. Beeghly informed Monsanto of his evaluation in a "Certificate of Health Care Provider" report. Based on Beeghly's evaluation, Monsanto denied Noble's request for medical leave and requested he return to work. When Noble did not return to work on January 20, 1996, Monsanto discharged him from employment. On March 1, 1996, Noble received his right to sue letter from the Iowa Civil Rights Commission.

## II. Standards for Summary Judgment

A court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Engstrand v. Pioneer Hi–Bred Int'l,* 946 F.Supp. 1390, 1396 (S.D.Iowa 1996), *aff'd,* 112 F.3d 513 (8th Cir.1997). "The moving parties ... bear the burden of showing that no genuine issue of material fact exists." *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993).

In considering a motion for summary judgment, "the court's function is to determine whether ... a reasonable jury could return a verdict for the nonmoving party based on the evidence." *Quick v. Donaldson Co.,* 90 F.3d 1372, 1377 (8th Cir.1996) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). A party seeking to defeat a motion for summary judgment "must go beyond the pleadings, and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Chester,* 869 F.Supp. at 705.

The court must consider all facts in the light most favorable to the nonmoving party. *Chester,* 869 F.Supp. at 705 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). The court is not, however, required to ignore undisputed evidence in the record that supports the motion. *Aucutt v. Six Flags Over Mid–America,* 85 F.3d 1311, 1315 (8th Cir.1996).

### III. Analysis

#### A. *Title VII and Iowa Civil Rights Act Claims*

■ Noble claims that the alleged sexual harassment he suffered created a hostile work environment and constituted constructive discharge from employment in September 1995, in violation of Title VII and the ICRA. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Similarly, the ICRA makes it unlawful for an employer "to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, national origin, religion, or disability...." Iowa Code § 216.6. The court applies Title VII analysis for hostile-work-environment sexual harassment claims brought under the ICRA. *Lynch v. City of Des Moines,* 454 N.W.2d 827, 833 (Iowa 1990).

##### 1. *Prima Facie Case*

To establish a prima facie case of sex discrimination by hostile-work-environment sexual harassment, a plaintiff must show: 1) the plaintiff belongs to a protected class; 2) the plaintiff was subject to unwelcome sexual harassment; 3) the harassment was based upon sex; 4) the harassment affected a term, condition or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. *Quick,* 90 F.3d at 1377; *Kopp,* 13 F.3d at 269; *Burns v. McGregor Electronic Industries, Inc.,* 955 F.2d 559, 563 (8th Cir.1992); *Lynch,* 454 N.W.2d at 833. If the plaintiff's "evidence is insufficient to establish an essential element of [the] sexual harassment claim, summary

judgment in favor of [defendant is] mandated." *Zirpel v. Toshiba America Info. Sys., Inc.,* 111 F.3d 80, 81 (8th Cir.1997) (citing *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53).

##### a. *Member of a Protected Class*

Both males and females can be members of a protected class. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). "Membership in a protected group is satisfied by showing that the plaintiff employee is a man or a woman. The term 'sex' as used in Title VII has accordingly been interpreted to mean either 'man' or 'woman,' and to bar workplace sexual harassment against women because they are women and against men because they are men." *Quick,* 90 F.3d at 1377.

Noble satisfies the first requirement of the prima facie case.

##### b. *Harassment Based on Sex*

■ "[A]ny harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII." *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988); *accord Lynch,* 454 N.W.2d at 834. The predicate acts that support a hostile-environment sexual harassment claim need not be explicitly sexual. *Gillming v. Simmons Indus.,* 91 F.3d 1168, 1171 (8th Cir.1996) (citing *Kopp,* 13 F.3d 264, 269); *accord Quick,* 90 F.3d at 1377.

The key inquiry is whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Quick,* 90 F.3d at 1379 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). Evidence that members of one sex were the primary targets of harassment is sufficient to show conduct is gender-based for purposes of summary judgment. *Quick,* 90 F.3d at 1378 (citing *Kopp,* 13 F.3d at 269–70). The mere fact that

incidents of harassment are vulgar or explicitly sexual in nature does not, without more, mean the harassment is necessarily based on gender. *See generally Quick,* 90 F.3d at 1379 (holding genuine issue of material fact existed as to whether harassment was gender based, where the record contained incidents of bagging (hitting someone's testicles or upper thigh, or snapping someone in the groin area) only male employees; fact finder could reasonably conclude treatment of men was worse than treatment of women); *Kriss v. Sprint Communications Co., Ltd.,* 58 F.3d 1276, 1281 (8th Cir.1995) (holding that rude gender-specific vulgarities such as "bitch," "do not furnish much proof of gender discrimination"); *Gillming,* 91 F.3d at 1169–70 (holding that behaviors including yelling, "I don't want to rape you. I just want to have sex with you," striking female plaintiff with both hands in the chest, and pointing at her while making sexually harassing comments did not constitute sexual harassment); *Bolden v. PRC, Inc.,* 43 F.3d 545, 549 (10th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995) (holding that several racial slurs or jokes followed later by over 20 incidents of "general torment" including expelling flatus directly at plaintiff and referring to plaintiff as "dickhead," "dumb-shit," "asshole," "faggot," and "fool," were not racially discriminatory and, therefore, not actionable); *Miller v. Aluminum Co. of America,* 679 F.Supp. 495, 501 (W.D.Pa.1988), *aff'd,* 856 F.2d 184 (3d Cir. 1988) (finding no Title VII sexual discrimination where one female employee argued that another female employee was receiving preferential treatment, because "male employees in [the] workplace shared with her the same disadvantages.... Favoritism and unfair treatment, unless based on a prohibited classification, do not violate Title VII").

Here, Noble's co-workers ridiculed him. The issue, however, is whether this ridicule would not have occurred but for Noble's sex.

Noble's nicknames "Thumbske," "K.I.A," and "Gadfly," and comments written on employees' schedules and calendars and on Noble's locker were evaluative comments and tasteless jokes, but do not constitute sex-based harassment. The record indicates that on two separate occasions harassing comments were made to female workers, which Monsanto responded to each time by reminding employees to be professional and that harassment was not allowed. Noble admits that he participated in similar name-calling and called male and female co-workers by nicknames, because it was common practice in the compounding area. He does not suggest that the other depictions of the "gadfly" (i.e. playing a guitar, dressed in a superman costume, and as a bedbug) or nicknames used by and about him were sexually explicit or vulgar. Nor does Noble allege that women were excluded from the name calling or that men generally were targeted for harassment because they were male.

█ Ridicule is not actionable absent showing that the harassment was based on sex. No such showing was made, nor was any material question of fact raised related to Noble's nicknames to suggest the inference of sexual harassment. Noble has not asserted any basis beyond mere speculation for a reasonable fact finder to conclude any of the alleged harassment occurring as a result of these nicknames and name-calling was directed at him because of his gender.

█ Noble alleges that he was harassed in 1992 when three drawings depicting sexually explicit subject matter were displayed in the workplace. First, a drawing of a man sodomizing a woman was hung on the men's restroom wall. Noble's name was written on the paper above the drawing. Second, Noble describes a drawing of a deer sodomizing a hunter, with Noble's name written on the hunter. The third drawing was "Gadfly's Prey."

A drawing's sexually explicit content does not alone, without more, establish or raise an inference that a particular sex was the primary target of harassment. *See Kriss,* 58 F.3d at 1281; *Gillming,* 91 F.3d at 1169–70. The drawing of a man sodomizing a woman and the drawing's portrayal in "Gadfly's Prey" of an unnamed woman with exposed genitalia placed all women at Monsanto in disadvantageous employment conditions equal to Noble's, because, to the extent the drawings were derisive, denigrating, or otherwise had negative connotations, both de-

picted women and Noble in an equally negative context.[3] *See Miller,* 679 F.Supp. at 501. Here, unlike in *Quick,* the victims of the alleged harassment consisted of members of both sexes. Noble admits that there was no harassment that was sexually explicit or vulgar after the "Gadfly's Prey" incidents in 1992. Noble has not asserted any basis beyond mere speculation for a reasonable fact finder to conclude that these isolated drawings were displayed because of Noble's gender.

Reviewing all the facts and inferences in Noble's favor, the Court holds that Noble has not raised a genuine issue of material fact concerning whether the alleged harassment exposed him to disadvantageous terms or conditions of employment to which members of the other sex were not exposed. *See Quick,* 90 F.3d at 1379 (quoting *Harris,* 510 U.S. at 25, 114 S.Ct. at 372 (Ginsburg, J., concurring)). He has raised no issue of material fact that the harassment he received would not have occurred but for his sex. *See Hall,* 842 F.2d at 1014; *Lynch,* 454 N.W.2d at 834. As a matter of law, Noble has not established this element of his prima facie case.

#### c. Harassment Affected a Term, Condition, or Privilege of Employment

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. Whether an environment is hostile or abusive can be determined only by analyzing all the circumstances. This may include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Quick,* 90 F.3d at 1378 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. at 371).

**3.** Given the circumstance of the numerous non-sexually explicit "gadfly" drawings exhibited throughout the workplace prior to the appearance of "Gadfly's Prey" and the association of

Evaluative comments do not achieve the severity necessary to indicate a hostile work environment. *Kriss,* 58 F.3d at 1281.

Calling a particular person ugly or using an epithet characterizing a person as unpleasant is not particularly probative.... Specifically, the word 'bitch,' ... is not an indication of a general misogynist attitude. Rather it is a crude gender-specific vulgarity, which in this case was directed toward only one woman, rather than women in general. (We note the existence of many vulgar epithets that are used only of men that, we believe, would not be indicative of animus against males.) Hence, we do not find [defendant's] use of this term to be particularly probative of gender discrimination.

*Id.* at 1281.

▮▮▮ Similarly, isolated incidents of sexual harassment would not be considered pervasive enough to constitute a hostile work environment. *Lynch,* 454 N.W.2d at 832. The mere utterance of an ethnic or racial epithet that engenders offensive feelings in an employee does not affect the terms, conditions or privileges of employment. *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 633 (Iowa 1990). "[A] sexually hostile-work-environment claim clearly is that of a pattern of harassment, a violation over time; we doubt that a sexually hostile work environment could be shown by proving only one incident of sexual harassment." *Lynch,* 454 N.W.2d at 832. In a case where the court held that remarks demeaning to women published in five issues of an organization's newsletter did not constitute sexual harassment, the court held, "Title VII cannot remedy every tasteless joke or groundless rumor that confronts [employees] in the workplace." *DeAngelis v. El Paso Mun. Police Officers Assoc.,* 51 F.3d 591, 595 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995). Similarly, an award of summary judgment was sustained on the basis that the plaintiff "did not present evidence to support the inference of pervasive racial harassment,"

the gadfly with Noble, the Court assumes both Noble and his co-workers recognized the fly in "Gadfly's Prey" as representing Noble.

where an employee complained of only two overtly racial remarks and one arguably racial comment during eight years of employment, and non-racial general ridicule became prevalent after the overt racial remarks. *Bolden,* 43 F.3d at 545. Summary judgment was also granted where a plaintiff alleged that two pornographic photographs were displayed in the work place, the employer "grabbed [plaintiffs] butt" and commented that she had a "nice butt," a co-worker called the plaintiff "bitch," and subscriptions to Penthouse magazines were sent to the plaintiff's home. *Callanan v. Runyun,* 903 F.Supp. 1285, 1298 (D.Minn.1994), *affirmed,* 75 F.3d 1293 (8th Cir.1996). The court reasoned, "when viewed in the context of the two-year period in which these events occurred, it may not be legitimately said that the objectionable conduct permeated the workplace." *Id.* In *Quick,* one hundred incidents of "bagging" in two-years was found to be sufficiently severe and pervasive to alter conditions of employment. *Quick,* 90 F.3d at 1378.

■ Here, the frequency of the harassment that was explicitly sexual was low and isolated in time: allegedly three incidents that occurred in close succession beginning and ending in 1992. As a matter of law, these isolated incidents, even if targeted at Noble because he was male, were not pervasive or severe enough to constitute an abusive work environment.

The balance of the alleged harassment, including name-calling, nicknames, and generic gadfly drawings amounted to the equivalent of mere offensive utterances and were not sufficiently severe to create a hostile work environment. Noble failed to produce evidence that would allow a reasonable fact finder to find that sexual harassment was severe and pervasive. As a matter of law, Noble did not establish this element of the prima facie case.

Because Noble has failed to present a triable question of fact on two essential elements, summary judgment is mandated. *Zirpel,* 111 F.3d at 81. However, the Court will briefly discuss the remaining elements to complete the analysis.

#### d. *Unwelcome Sexual Harassment*

Sexual harassment does not need to be explicitly sexual in nature. *Quick,* 90 F.3d at 1377; *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1326 (8th Cir. 1994); *Hall* 842 F.2d at 1014. "In order to constitute harassment, the conduct must be 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Hall,* 842 F.2d at 1014 (citing *Moylan v. Maries County,* 792 F.2d 746, 749 (8th Cir.1986)). Another consideration in determining whether the harassment was unwelcome is the plaintiff's own behavior. "The proper inquiry is whether the plaintiff indicated by his conduct that the alleged harassment was unwelcome." *Quick,* 90 F.3d at 1377 (citing *Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406); *see Lynch,* 454 N.W.2d at 834.

The evidence in this case is conflicting as to whether the conduct was unwelcome. On one hand, Noble's own work behavior objectively suggests a high level of tolerance to explicit sexual material and general name-calling of employees. Noble admits that while at work he told sexist jokes, made gestures imitating oral sex when co-workers were speaking with supervisors, viewed pornography on the Internet and showed it to other employees, and watched a pornographic video. Noble also admits that he called or referred to co-workers by their nicknames and wrote non-work related comments on a co-worker's mail.

On the other hand, Noble complained to his supervisor and to human resources personnel about the ridicule, name-calling, and drawings that were directed at him. Although he did not identify this treatment as sexual harassment, the fact that he complained suggests that the conduct was unwelcome. Therefore, viewing the evidence in the light most favorable to Noble, without judging credibility, the Court holds that this element would be an appropriate question for the trier of fact.

#### e. *Employer's Knowledge of Harassment*

"The liability of an employer for sexual harassment by one nonsupervisory employee

to another is not strict. The plaintiff must prove that the employer was negligent in having failed to discover and prevent it." *Zimmerman v. Cook County Sheriff's Dep't,* 96 F.3d 1017, 1018 (7th Cir.1996). Sexual harassment by co-workers violates Title VII, if the employer knew or should have known about the harassment and failed to take action. *Quick,* 90 F.3d at 1378 (citing *Burns,* 989 F.2d at 966); *Vaughn,* 459 N.W.2d at 634. "[A] company cannot be held liable for an isolated racial slur. But a company will be liable if management-level employees knew, or in the exercise of reasonable care should have known, about a barrage of offensive conduct." *Hall,* 842 F.2d at 1015. In response to a sexual harassment complaint, the employer is not required to terminate accused co-workers but must take "prompt remedial action reasonably calculated to end the harassment." *Barrett v. Omaha Nat'l Bank,* 726 F.2d 424, 427 (8th Cir.1984) (citing *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir. 1983)). The content of a plaintiff's complaints to the employer is also relevant in determining whether the employer was put on notice of illegal harassment. *Meritor,* 477 U.S. at 68–69, 106 S.Ct. at 2406–07. "But when .... the only possible source of notice to the employer ... is the employee who is being harassed, she cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Zimmerman,* 96 F.3d at 1019 (affirming summary judgment where "the implication [of the employee's complaint to the employer] was that it was a personality conflict with someone else, an unnamed someone else, and a personality conflict [which] is not a form of sexual harassment").

The record shows that Monsanto made some effort to respond to Noble's complaints of alleged harassment (whether or not it was illegal harassment as defined in Title VII), by removing the drawings from the workplace, asking Noble if he knew the identity of the person(s) responsible for the drawings, washing or painting graffiti from bathroom walls, and reminding employees of the anti-harassment policy. When Noble complained to his supervisor or the human resources representatives, Noble did not indicate that the harassment he was subjected to was sexual harassment. Other than the sexually explicit drawings in 1992, the ridicule directed at Noble contained no sexual content. No evidence indicated he was targeted for harassment because of his sex. Monsanto had insufficient information to conclude that Noble was being sexually harassed. Monsanto responded to Noble's direct complaints and had no actual notice that the alleged sexual harassment existed, or if it existed that it was on-going.

However, the frequency of the general harassment, the harassing events involving two female employees, and the repeated need to remove graffiti from the men's restroom walls suggests that it is possible that Monsanto, in the exercise of reasonable care, should have known of the alleged on-going harassment. Whether Monsanto had constructive notice of the alleged harassment and whether it took "prompt remedial action reasonably calculated to end the [alleged] harassment" is a question of fact. The Court concludes that the question of the employer's knowledge of the alleged harassment and adequacy of remedial action would be an appropriate question for the trier of fact.

### 2. *Timely Filing and Continuing Violation*

Had Noble been able to state a prima facie case for sexual harassment, he would still be required to show that his complaints were filed within the limitations period.

Title VII requires that a charge for sexual harassment be filed within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e). The timely filing requirement is extended to 300 days when the aggrieved party initially files the complaint with a state agency such as the Iowa Civil Rights Commission 42 U.S.C. § 2000e–5(e). Under the ICRA a charge must be filed within 180 days ot the alleged unlawful employment practices. Iowa Code § 216.15(12).

Under certain circumstances, where a party challenges an ongoing pattern or practice of discrimination rather than one isolated

instance, the alleged violation may be considered continuing. *Chaffin v. Rheem Manufacturing Co.,* 904 F.2d 1269, 1271 (8th Cir. 1990) (citing *Satz v. ITT Fin. Corp.,* 619 F.2d 738, 743 (8th Cir.1980)). "[Past discrimination] may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, [past discrimination] is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555, 97 S.Ct. 1885, 1887, 52 L.Ed.2d 571 (1977). Under the continuing-violation theory, at least one instance of discrimination must have occurred within the filing period, and the earlier acts must be part of the continuing policy or practice that includes acts within the filing period. *Jenkins v. Wal–Mart Stores, Inc.,* 910 F.Supp. 1399, 1414 (N.D.Iowa 1995) (citing *Gardner v.* Morris, 752 F.2d 1271, 1279 (8th Cir.1985); 'add'l citations omitted). A plaintiff may not assert a continuing violation based on past isolated instances, even where the effects persevere into the present. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Iowa courts pattern continuing-violation analysis on federal Title VII cases. *Jenkins,* 910 F.Supp. at 1414.

If Noble had been targeted with the explicitly sexual drawings for on-going harassment based on his sex, he offers no nexus between the display of explicitly sexual drawings in 1992 and the generic harassment that began in 1991 and continued through 1995. Thus he fails to show that actionable harassment was ongoing. Noble filed his complaint with the Iowa Civil Rights Commission on November 13, 1995. Reviewing Noble's prima facie case in the light most favorable to him, the Court finds that Noble failed to provide a triable issue for the jury that any of the harassment he received was based on sex. Even if Noble had been able to provide evidence that the events in 1992 would not have occurred but for his sex and that they affected a term, condition, or privilege of employment, Noble still has not related those acts to acts of discrimination within the 300–day filing period.

With no discriminatory events based on sex occurring during the filing period, Noble's assertion of a continuing violation fails. Therefore, Defendant's Motion for Summary Judgment on the issue of statute of limitations is granted and the civil rights claims (Counts I & II) are dismissed.

### 3. *Constructive Discharge*

Counts I and II contain an interrelated claim of constructive discharge resulting from Monsanto's alleged unlawful employment practices under Title VII. To establish constructive discharge, a plaintiff must show that the "[defendant] deliberately created intolerable working conditions with the intention of forcing [plaintiff] to quit." *Hanenburg v. Principal Mut. Life Ins. Co.,* 118 F.3d 570, 574 (8th Cir.1997) (citing *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir. 1981)). The intent requirement can also be satisfied by showing that the plaintiff's "resignation was a reasonably foreseeable consequence of her employer's discriminatory actions." *Hanenburg,* 118 F.3d at 575 (citing *Hukkanen v. International Union of Operating Eng'rs & Portable Local No. 101,* 3 F.3d 281, 285 (8th Cir.1993)).

Without stating a prima facie case for hostile-work-environment sexual harassment, Noble cannot assert constructive discharge based on sexual harassment. Additionally, Noble has offered no evidence to show that Monsanto deliberately created an intolerable work environment, or that Noble's resignation was a reasonably foreseeable result of Monsanto's alleged discriminatory actions. Noble has not presented a genuine issue of material fact, and his claim of constructive discharge resulting from hostile-work-environment sexual harassment therefore fails.

### B. *Intentional Infliction of Emotional Distress*

■ To establish a claim of intentional infliction of emotional distress, a plaintiff must show: 1) outrageous conduct by the defendant; 2) the defendant's intentional causing, or reckless disregard of the probability of causing, emotional distress; 3) plaintiff suffered severe or extreme emotional distress; and 4) actual and proximate causation.

*Vinson v. Linn–Mar Community School,* 360 N.W.2d 108, 118 (Iowa 1984).

■ To be recognized as outrageous, the conduct must be" 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Harsha v. State Savings Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (quoting Restatement (Second) of Torts § 46, Comment d (1965)). A court must determine whether the relevant conduct may reasonably be regarded as outrageous. *Vinson,* 360 N.W.2d at 118 (citing *Roalson v. Chaney,* 334 N.W.2d 754, 756 (Iowa 1983)). "When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance." *Vaughn,* 459 N.W.2d at 636 (citing *Northrup v. Farmland Indus. Inc.,* 372 N.W.2d 193, 199 (Iowa 1985)). In *Vinson,* "a deliberate campaign to badger and harass plaintiff" did not rise "to the level of extremity essential to support a finding of outrageousness." *Vinson,* 360 N.W.2d at 119.

■ Noble was subjected to repeated name-calling by co-workers. "Thumbske," "gadfly," and "K.I.A." were terms used by co-workers to ridicule and irritate Noble. Though perhaps not as frequently as Noble, many employees were subject to this type of name-calling. However inappropriate and unprofessional, general name-calling and ridicule does not satisfy the outrageousness element required for intentional infliction of emotional distress. Similarly, the isolated incidents of obscene drawings in 1992 do not elevate this ongoing workplace ridicule to the level of outrageousness required by Iowa law to state a claim for relief. Because Noble has failed to raise any material questions of fact on the issue of outrageous conduct or causation by the employer, the Court grants Monsanto's Motion for Summary Judgment as to Count III.

### C. *Loss of Consortium*

■ Where the defendant is not liable for direct claims by one spouse, the loss of consortium claim cannot be maintained. *Ziegler v. United States Gypsum Co.,* 251 Iowa 714, 102 N.W.2d 152, 153 (1960); *Richards v.*

*Atchison, Topeka & Santa Fe Railroad Co.,* 226 F.Supp. 812, 814 (S.D.Iowa 1964). Noble failed to state a claim for intentional infliction of emotional distress. As a result, Kelly Noble's loss-of-consortium claim also fails.

Monsanto also asserted the defense that the intentional infliction of emotional distress and loss of consortium claims were preempted by Iowa's workers' compensation law. Because the Court finds these claims were not established, the Court declines to consider whether the claims would have been preempted by workers' compensation.

### IV. Conclusion

Defendant's Motion for Summary Judgment is granted on Count I (Title VII) and Count II (ICRA), because Noble failed to raise material questions of fact to support, as a matter of law, all the elements of a prima facie case for hostile-work-environment sexual harassment or constructive discharge. Additionally, Noble has not established a continuing violation in order to have stated his claim for events occurring in 1992 within the applicable statute of limitations. Summary judgment is granted on Count III, intentional infliction of emotional distress, because the general harassment that occurred could not reasonably be regarded as outrageous. Summary judgment is granted on Count IV, loss of consortium; the claim cannot be maintained because Defendant is not liable for the underlying injury to the spouse. Judgment shall be entered in favor of Defendant on all counts of the complaint.

IT IS SO ORDERED.